733 A.2d 1055

**CHEVY CHASE LAND COMPANY et al.**

v.

**UNITED STATES et al.**

**Misc. No. 24, Sept. Term, 1998.**

Court of Appeals of Maryland.

July 29, 1999.

**112**

**116**

William J. Utermohlen, Oliff & Berridge, PLC, Virginia, for Chevy Chase Land Co.

Whayne S. Quin (Paul J. Kiernan, Wilkes, Artis, Hedrick & Lane, Chtd., for Columbia Country Club, all on brief), Washington, DC, for appellants.

Sean H. Donahue, Lois M. Schiffer, Asst. Atty. Gen.; Andrew M. Eschen, all on brief, Washington, DC, for Environment and Natural Resources Div., Dept. of Justice.

Henri F. Rush, Evelyn G. Kitay, Office of the General Counsel, all on brief, Washington, DC, for Surface Transp. Bd.

Diane R. Schwartz-Jones, Associate County Atty. (Charles W. Thompson, Jr., County Atty., Marc P. Hansen, Chief, Div. of General Counsel, all on brief), Montgomery County, for defendant-appellee Montgomery County.

Andrea C. Ferster, Cornish F. Hitchcock, Richard B. Nettler (Robins Kaplan Miller & Ciresi, LLP), Washington, DC, amicus curiae for Rails-to-Trails Conservancy.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

This case comes to us by a certified order pursuant to Maryland Code (1974, 1998 Repl.Vol.), Courts & Judicial Proceedings Article, §§ 12–603 to 12–609 from the United States Court of Appeals for the Federal Circuit. That court seeks our resolution of the parties' state law property disputes so that it may determine whether an uncompensated taking of private property has occurred in violation of the Fifth Amendment of the United States Constitution.[1] The questions pertain to a right-of-way in Montgomery County called the "Georgetown Branch" that was granted to a railroad in 1911 and that has been converted for use as a hiker/biker trail under the federal "Rails–to–Trails" Act (the Act).

Specifically, the case requires that we construe a 1911 deed from appellant Chevy Chase Land Company of Montgomery County (CCLC or the land company) to the Metropolitan Southern Railroad Company (MSRC or the railroad),[2] which is a predecessor in interest to the right-of-way now owned by appellee Montgomery County (the County). Additional parties to this appeal include appellant Columbia Country Club (Country Club), which claims an interest in the right-of-way for which it should be compensated, and appellee the United States, which along with the County was named as a defendant in this takings claim. The certified questions are as follows:

1. Under Maryland law, did the 1911 deed convey an interest in fee simple absolute or an easement?

2. If the deed conveyed an easement, is the easement subject to any limitations as a matter of law?

---

**1.** The Fifth Amendment of the United States Constitution states in pertinent part: "nor shall private property be taken for public use, without just compensation".

**2.** The Metropolitan Southern Railroad Company (MSRC) was a subsidiary of the B & O Railroad, which later became a subsidiary of the CSX Corporation. Unless otherwise indicated, for purposes of this opinion we shall refer to the MSRC, B & O, or CSX simply as the "railroad."

3. If the deed conveyed an easement, has the easement been abandoned as a matter of law since its conveyance and, if so, when?

We examine each of the certified questions, in *seriatim*.

Addressing the first question in Part II, we conclude that the 1911 deed granting a "right-of-way" to the railroad conveyed an easement. The use of the "right-of-way" language provides a strong indication that the parties intended to convey an easement as opposed to an estate in fee simple absolute. We find nothing in the deed to indicate that anything more than a right of passage was intended, particularly in light of the deed's separate grant "in fee simple" of other land upon which a passenger station was to be located. Our conclusion is confirmed by the circumstances of the conveyance, including the 20–year existence of the railway and the nominal consideration paid by the railroad for the right-of-way. Moreover, the conveyance of the right-of-way in fee simple would not have furthered any purpose of the railway not served by its conveyance as an easement and could adversely affect the public's interest in the best use of the land. *See* Part II.B., *infra*.

Regarding the second certified question, we conclude in Part III that use of the right-of-way as a recreational trail falls within the scope of the easement. The language of the deed includes no express limitations on the use of the right-of-way; rather, it indicates through its use of terms such as "free" and "perpetual" that the parties contemplated general use of the land as a way of passage through Montgomery County. In light of our decisions holding that easements for public highways are subject to reasonable changes in mode of transportation and the railroad's status as a highly regulated public service corporation, recreational trail use of a general use right-of-way is within the legally anticipated scope of the 1911 deed. Finally, the use of the right-of-way as a trail poses no unreasonable burden on the underlying fee simple estate, as it is self-evident that bikers and walkers inflict less of a burden on a right-of-way than a freight railroad.

In Part IV we explain why, as a matter of law, the railroad did not abandon its easement prior to assigning it to Montgomery County in 1988. To the extent that the appellants' arguments regarding abandonment hinge on their contention that the scope of the easement is limited to railroad purposes, our holding in Part III also disposes of this issue. Even if appellants' abandonment arguments are not contingent upon a more limited scope, there is insufficient evidence for appellants to meet their burden of proving abandonment. When determining whether there is an abandonment, the fact that the easement is regulated by federal railroad law is a circumstance that may be relevant to the intent to abandon. The railroad's actions in conformance with federal law cannot supply the decisive and unequivocal act necessary to prove that it abandoned its state law property interest. This is particularly the case when the railroad's actions were entirely consistent with an intent to sell the right-of-way and when a finding otherwise would mean that the railroad intended to violate federal law, exposing itself to criminal and civil liability, when no evidence would support the finding of such an intent. Finally, appellants presented no other evidence that would be sufficient to support a finding of abandonment.

## I. BACKGROUND

### A. Factual Background

The stipulated facts show the following. The property alleged to have been taken and for which the appellants seek compensation is a strip of land approximately one mile long and 100-feet wide, spanning some 12 acres in Montgomery County, Maryland, that lie on either side and across Connecticut Avenue in Chevy Chase. The mile-long stretch is a segment of an approximately 6.4 mile former railroad line in Montgomery County known as the Georgetown Branch, which runs from Silver Spring southwesterly into the District of Columbia.

The land company was founded in 1890 in part to develop the residential area now known as Chevy Chase and it then

owned all the land relevant to this case. In 1891, the land company and the railroad entered into an agreement whereby the land company would convey the "right-of-way" over the mile-long stretch of land and a second parcel "for the purposes of a passenger and freight depot." As part of the agreement, the railroad agreed to erect a passenger station on the second parcel to cost not less than $4,000 (or it would contribute $4,000 toward the land company's construction of the station), to build the tracks to Connecticut Avenue on or before August 31, 1891, and to charge the land company half rates on freight delivered over the line. The railroad missed the August 31, 1891, deadline, but built that portion of the line in 1892, while the rest of the line was not completed until 1910; it never built the passenger and freight station nor did it pay the $4,000 toward the land company's construction of the station. In 1909, the Country Club bought more than 125 acres of land from the land company primarily for use as a golf course. The deed conveyed the property in two separate parcels described by metes and bounds with one parcel on each side of the railroad's right-of-way.

In 1911, after the railroad line had been constructed and in operation for 19 years, the land company executed a deed conveying to the railroad, "its successors and assigns, a free and perpetual right of way" over the land referred to in the 1891 agreement. The deed also conveyed, in "fee simple," the parcel of land on which the depot was to have been built. The railroad paid $4,000 for the conveyance, and the deed stated that the 1891 agreement was "mutually abrogated, canceled and set aside, and the [railroad] is hereby released and discharged from the obligation ... of erecting a passenger station to cost not less than Four Thousand (4,000) Dollars." *See* Part II.C.1.

The railroad used the right-of-way for shipping freight continuously from 1892 until 1985, when damage to a bridge on the right-of-way prevented its use. Between 1969 and 1985, however, traffic over the line had decreased by over 90%. In 1983, in conformance with federal law, the railroad posted a notice on the Georgetown Branch that it would be the

subject of an abandonment application before the Interstate Commerce Commission (ICC). A series of internal corporate decisions were made by the railroad in 1984 and 1985 to abandon service over the Georgetown Branch. On April 9, 1986, the railroad applied to the ICC for authorization to abandon rail service on the line, as required by federal regulation. *See* 49 U.S.C. § 10903 (1988);[3] 49 C.F.R. §§ 1152.20–22; and Part IV.A.2. The ICC issued a tentative decision on February 25, 1988, permitting abandonment on condition that the railroad continue to maintain the right-of-way in order to facilitate the possible acquisition of the right-of-way for public use pursuant to the Rails–to–Trails Act, which is codified at 16 U.S.C. § 1247(d)(1988)(*see* footnote 3).

After the ICC's tentative decision, Montgomery County began discussions with the railroad about acquiring the right-of-way for a light-rail system as well as a hiker/biker path pursuant to the Rails–to–Trails Act. On December 12, 1988, the ICC approved the purchase and transfer of use of the right-of-way to Montgomery County. Four days later the railroad conveyed the entire Georgetown Branch to Montgomery County by quitclaim deed for the County's payment of $10 million. As described in more detail in Part IV.A.2., as a result of the ICC's actions pursuant to the Act, regulatory abandonment of the railroad right-of-way was delayed indefinitely.

We will provide more facts as we examine each of the certified questions. Additional facts are also available in the opinion of the federal trial court, *Chevy Chase Land Co. of Montgomery v. U.S.*, 37 Fed.Cl. 545 (1997).

B. Summary of Arguments and Case History

The plaintiffs/appellants assert that the 1911 deed conveyed an easement. They further argue that the proposed use of the easement as a hiker/biker trail is beyond its scope,

---

**3.** In this opinion, we shall cite to federal laws and regulations existing in 1988, when the Interstate Commerce Commission (ICC) issued its order and when the right-of-way was conveyed to Montgomery County.

which they contend is limited to railroad uses. Alternatively, they contend that the easement was abandoned prior to the railroad's conveyance of the quitclaim deed to the County. Accordingly, appellants conclude that a reversion of the easement occurred and that they own the right-of-way unencumbered by any other interest. Thus, they are seeking compensation in federal court for the "taking" of their interest in the right-of-way by Montgomery County under the Rails-to-Trails Act.

Defendants/appellees Montgomery County and the United States, on the other hand, argue that the 1911 deed conveyed to the railroad an interest in the right-of-way in fee simple absolute and therefore the appellants have had no interest in the property since 1911. Alternatively, should the deed be found to have conveyed an easement, they contend that the use of the right-of-way as a hiker/biker trail pursuant to federal law is within the scope of the easement and that the railroad never abandoned the easement. Accordingly, they conclude that no taking occurred. We are concerned only with the state law property issues and not with the takings claim itself.

The United States Court of Federal Claims (CFC), where appellants filed their takings claim, found in favor of Montgomery County and the United States. *Chevy Chase Land Co. of Montgomery, supra.* The CFC concluded that the 1911 deed conveyed a fee simple absolute and granted summary judgment in favor of appellees. *Chevy Chase Land Co. of Montgomery,* 37 Fed.Cl. at 565–75. Although that conclusion disposed of the case, the CFC went on, in *dicta,* to conclude that if it was an easement that was conveyed, the easement was abandoned by the railroad prior to its conveyance to the County. *Chevy Chase Land Co. of Montgomery,* 37 Fed.Cl. at 575–80. Also in *dicta,* the CFC stated that the language of the 1911 deed did not limit the scope of the easement to railroad purposes (thereby implying that the use as a hiker/biker trail would not cause a reversion) but that if the deed were limited to railroad purposes, the proposed use would be beyond the scope of the easement, thereby causing a reversion

giving rise to a takings claim. *Chevy Chase Land Co. of Montgomery,* 37 Fed.Cl. at 585–87. The land company and the Country Club appealed to the United States Court of Appeals for the Federal Circuit, which certified the state law property questions to this court.

## II. THE RAILROAD'S PROPERTY INTEREST

The first question asks whether the 1911 deed conveyed an interest in fee simple absolute or an easement. The question requires that we construe the 1911 deed between the land company and the railroad. We begin with a summary of the principles involved in construing a deed. We then consider how the courts of this State and other states have construed the phrase "right-of-way." We then apply those principles to the deed conveyed by the land company to the railroad.

### A. Basic Principles of Deed Interpretation

In construing a deed, we apply the principles of contract interpretation. *Buckler v. Davis Sand, Etc., Corp.,* 221 Md. 532, 537, 158 A.2d 319, 322 (1960). These principles require consideration of " 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution,' " *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358, 363 (1999)(quoting *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985)). At least initially, the construction of a deed is a legal question for the court, and on appeal, it is subject to *de novo* review. *Calomiris,* 353 Md. at 433–35, 727 A.2d at 362–63. "It is a cardinal rule in the construction of deeds that 'the intention of the parties, to be ascertained from the whole contents of the instrument, must prevail unless it violates some principle of law.' " *D.C. Transit Systems v. S.R.C.,* 259 Md. 675, 686, 270 A.2d 793, 798–99 (1970)(*D.C. Transit I* )(quoting *Marden v. Leimbach,* 115 Md. 206, 210, 80 A. 958, 959 (1911)). Thus, we must consider the deed as a whole, viewing its language in light of the facts and circumstances of the transaction at issue as well as the governing law at the time of conveyance.

## B. Right–of–Way

■ In railroad parlance, "the term 'right of way' has two meanings: in one sense it is 'the strip of land upon which the track is laid'; in the other sense it is 'the legal right to use such strip,' and in this sense it usually means the right of way easement." *Ma. & Pa. RR. Co. v. Mer.-Safe, Etc., Co.*, 224 Md. 34, 36–37 n. 1, 166 A.2d 247, 248 n. 1 (1960)(quoting *Quinn v. Pere Marquette Ry. Co.*, 256 Mich. 143, 239 N.W. 376, 379 (1931)). *See also Joy v. City of St. Louis*, 138 U.S. 1, 44, 11 S.Ct. 243, 256, 34 L.Ed. 843, 857 (1891)("[T]he term 'right of way' . . . sometimes is used to describe a right belonging to a party, a right of passage over any tract; and it is also used to describe that strip of land which railroad companies take upon which to construct their road-bed."). *Cf.* Philip A. Danielson, *The Real Property Interest Created In a Railroad Upon Acquisition of Its "Right of Way,"* 27 ROCKY MTN. L.REV. 73, 74 (1954)(noting the two meanings and stating that "[i]n law [right of way] is synonymous with 'easement'—a legal concept").

■ Nevertheless, it has generally been held by courts of this and other states that "deeds which in the granting clause convey a 'right of way' are held to convey an easement only." *Deed to Railroad Company as Conveying Fee or Easement,* Annotation, 6 A.L.R.3d 973, § 3, at 977 (1966); *The Real Property Interest Created In a Railroad Upon Acquisition of Its "Right of Way,"* 27 ROCKY MTN. L.REV. at 84 ("[I]f the conveyance is of a 'right of way,' or of land 'for a right of way,' the courts tend to find an *easement* ")(emphasis in original; footnote omitted). As explained in Professor Elliott's 1907 treatise on railroad law:

" 'Right of way,' in its strict meaning, is 'the right of passage over another man's ground;' and in its legal and generally accepted meaning, in reference to a railway, it is a mere easement in the lands of others, obtained by lawful condemnation to public use or by purchase. It would be using the term in an unusual sense, by applying it to an absolute

purchase of the fee-simple of lands to be used for a railway or any other kind of way."

2 ELLIOTT ON RAILROADS § 1158, at 628 n. 77 (3d. ed.1907)(quoting *Williams v. Western Union Railway Company*, 50 Wis. 71, 5 N.W. 482, 484 (1880)). *See also Richfield Oil Corp. v. Chesapeake & Curtis Bay Railroad Co.*, 179 Md. 560, 572, 20 A.2d 581, 587 (1941); *D.C. Transit I*, 259 Md. at 688, 270 A.2d at 799 (both quoting ELLIOTT ON RAILROADS).

Maryland courts have often construed deeds of "rights-of-way" to railroads as easements or have used the terms "easement" and "right-of-way" synonymously. *See, e.g., D.C. Transit I*, 259 Md. at 689, 270 A.2d at 800 ("The addition of the language for 'a right of way' in the *habendum* clause . . . makes clear the intent of the parties to grant an easement . . . .")(emphasis in original); *Richfield Oil Corp.*, 179 Md. at 572, 20 A.2d at 587–88 (quoting 2 ELLIOTT ON RAILROADS § 1158, at 627–28 (3d ed. 1907))("'Where the intention to convey a fee does not appear, as in case of the conveyance of a "right of way" for the railroad through certain lands, the company takes an easement only.'"); *Greenwalt v. McCardell*, 178 Md. 132, 136, 12 A.2d 522, 524 (1940)("Where a *right of way* is established by reservation, the land remains the property of the owner of the servient estate, and he is entitled to use it for any purpose that does not interfere with the *easement*.")(emphasis added); *Miceli v. Foley*, 83 Md.App. 541, 570, 575 A.2d 1249, 1264 (1990)("Absent an express intention to convey a fee, a grant of a right of way to a railroad is generally considered to be an easement."). Our cases are consistent with those of other jurisdictions.[4]

---

4. *See, e.g., City of Port Isabel v. Missouri Pacific. R. Co.*, 729 S.W.2d 939 (Tex.Ct.App.1987)(holding that deed to railroad "in fee simple" of "the right of way" conveyed an easement only); *Hartman v. J. & A. Development Co.*, 672 S.W.2d 364 (Mo.Ct.App.1984)(holding that a deed of a right-of-way conveyed an easement rather than a fee because use of term right-of-way and road are almost "conclusive indications" that the interest conveyed is an easement); *Fischer v. Trentmann*, 672 S.W.2d 139 (Mo.Ct.App.1984)(similar holding); *Pollnow v. State Dept. of Natural Resources*, 88 Wis.2d 350, 276 N.W.2d 738, 744 (1979)(quoting *Williams v. Western Union Railway Company*, 50 Wis. 71, 5 N.W. 482,

The general rule that the terms "right-of-way" and "easement" are synonymous came about because the rule is consistent with the likely intent of the parties to a deed when the term "right-of-way" is used. As we observed in *Green, Tr. v. Eldridge,* 230 Md. 441, 448, 187 A.2d 674, 678 (1963): "The fact that the word 'easement' was not used to designate the property interest passing is not of particular significance, since use of the phrase 'right of way' is generally understood to mean that only an easement is being granted." *See also Pub. Serv. Commn. v. Gas Etc. Corp.,* 162 Md. 298, 312, 159 A. 758, 763 (1932)(quoting *Bosley v. Susquehanna Canal,* 3 Bland 63, 67 (1830))(" 'A right of way, whether public or private, is essentially different from a fee simple right to the land itself over which the way passes. A right of way is nothing more than a special and limited right of use . . . .' ").

Furthermore, policy considerations support interpreting the conveyance of a "right-of-way" to a railroad as an easement where the intent to convey an estate in fee is not clearly expressed. A great number of railroad corridors have been abandoned in recent years. *See Preseault v. ICC,* 494 U.S. 1, 5, 110 S.Ct. 914, 918, 108 L.Ed.2d 1, 10 (1990)(observing that the nation's railway system has lost about 130,000 miles of

---

484 (1880)(" 'Right of way,' in its strict meaning, is 'the right of passage over another man's ground,' and in its legal and generally accepted meaning, in reference to a *railway,* it is a mere easement in the lands of others, obtained by lawful condemnation to public use, or by purchase.")(emphasis supplied)); *Veach v. Culp,* 92 Wash.2d 570, 599 P.2d 526 (1979)(use of language "right-of-way" is conclusive of intent to convey easement); *Hutson v. Agricultural Ditch & Reservoir Co.,* 723 P.2d 736 (Colo.1986)(holding that condemnation decree of right-of-way constituted an easement because an easement would accomplish purpose of decree); *Missouri–Kansas–Texas Railroad Company v. Freer,* 321 S.W.2d 731, 736 (Mo.Ct.App.1958)("Conveyances of right of way are held to create easements only.")(footnote omitted); *see also* RESTATEMENT (THIRD) OF PROPERTY § 2.2, "Intent to Create a Servitude" cmt. g (Tentative Draft No. 1, 1989)("The fact that the grantee is a railroad may also tend to indicate that the instrument should be construed to convey an easement only. The narrowness of the parcel, the consideration paid, and the frequency with which railroad uses have been abandoned often lead to the conclusion that the grantor, as a reasonable person dealing with a railroad, intended to grant no more than an easement for the right of way, retaining ownership of the land.").

track since 1920 and noting that "experts predict that 3,000 miles will be abandoned every year through the end of this century")(footnote omitted). Whether a right-of-way is construed as an estate in fee simple or an easement has significant implications for the utility of the land upon abandonment. If the deed of a right-of-way is construed as an estate in fee simple, the railroad will retain the right-of-way even after it is no longer used for any transit purposes—effectively severing otherwise contiguous pieces of property, and for no useful purpose. As the Indiana Supreme Court has explained:

> "Public policy does not favor the conveyance of strips of land by simple titles to railroad companies for right-of-way purposes, either by deed or condemnation. This policy is based upon the fact that the alienation of such strips or belts of land from and across the primary or parent bodies of the land from which they are severed[ ] is obviously not necessary to the purpose for which such conveyances are made after abandonment of the intended uses as expressed in the conveyance, and that thereafter such severance generally operates adversely to the normal and best use of all the property involved."

*Ross, Inc. v. Legler,* 245 Ind. 655, 199 N.E.2d 346, 348 (1964). *See also The Real Property Interest Created In a Railroad Upon Acquisition of Its "Right of Way,"* 27 ROCKY MTN. L.REV. at 74 (observing that construing a right of way as an easement "seems socially more desirable, since it helps clear titles and prevents long narrow strips of agricultural land from being separated from the adjoining farms, with attendant waste and inconvenience."). We have previously recognized that the construction of a right-of-way as a fee simple would not further any significant interest that is not served by construction as an easement. *See D.C. Transit I,* 259 Md. at 688, 270 A.2d at 800 (construing a deed to a railroad as an easement in part because it would not serve any useful purpose to convey "a strip of land 80 feet wide" as an estate in fee); *Ma. & Pa. RR. Co.,* 224 Md. at 37, 166 A.2d at 249 (following the "general rule . . . that a railroad company acquires only an easement in a right of way by prescription . . . . [because] the nature of the

user by the railroad requires no more than an easement in the right of way"). *See also Daugherty v. Helena & Northwestern Ry.*, 221 Ark. 101, 252 S.W.2d 546 (1952)(holding that a deed conveying a strip of land for a right-of-way created an easement rather than a fee primarily because the parcel would be useful for little else because of its shape); *Hartman v. J. & A. Development Co.*, 672 S.W.2d 364 (Mo.Ct.App.1984)(recognizing that long narrow strips of land serve little or no function other than for easements or rights-of-way).

 This is not to say that a deed conveying a "right of way" to a railroad cannot convey an estate in fee simple. It is well settled that a deed to a railroad, even though it characterizes the grant as conveying a right-of-way, may convey an estate in fee simple. *See Hodges v. Owings*, 178 Md. 300, 303, 13 A.2d 338, 339 (1940)(observing that the railroad's charter authorized it to take an estate in fee). However, when a deed conveying a right-of-way fails to express a clear intent to convey a different interest in land, a presumption arises that an easement was intended. "The logical rule ... is that where the deed is ambiguous *and* the granting clause is not specific, references to the interest being conveyed as a right-of-way gives rise to a presumption that an easement was intended." Danaya C. Wright, *Private Rights and Public Ways: Property Disputes and Rails–to–Trails in Indiana*, 30 IND. L.REV. 723, 740 (1997). *See also Miceli*, 83 Md.App. at 571, 575 A.2d at 1265 ("As there is insufficient evidence to rebut the presumption that a condemning railroad takes an easement, we hold that the railroad did not acquire a fee simple absolute in the property at issue.")

### C. Application to the 1911 Deed

#### 1.

The deed in question was executed on March 22, 1911, and recorded on April 4, 1911. In pertinent part, the granting clause of the deed states:

"[T]he said party of the first part [the land company] for and in consideration of the sum of FOUR THOUSAND

(4,000) DOLLARS, to it paid by the said party of the second part, *does hereby grant and convey* unto the said party of the second part [the railroad], its successors and assigns, *a free and perpetual right of way*, one hundred (100) feet wide, *over the land and premises hereinafter designated as 'Parcel A'* and does hereby *grant and convey* unto the said party of the second part [the railroad], its successors and assigns, *in fee simple, the land and premises, hereinafter designated as 'Parcel B'* . . . ." (Emphasis added).

The deed then provides a metes and bounds description of Parcel A, the "right-of-way," and Parcel B, the land granted in "fee simple." Parcel A is summarized as "being a *strip of land* fifty (50) feet wide on each side of the center line of the Metropolitan Southern Railroad through the land of [t]he Chevy Chase Land Company . . . ." (Emphasis added). The granting clause pertaining to Parcel A is made subject to an "existing right of way for highway and other purposes over what is known as Connecticut Avenue Extended."

The deed's warranty clause states:

"AND the said party hereto of the first part hereby covenants to warrant specially the property hereby conveyed, and to execute such further assurances of said land as may be requisite."

Finally, the deed provides that

"in consideration of the execution and delivery of this Deed, and of the payment of the consideration herein expressed, the . . . agreement entered into on [April 21, 1891] . . . is mutually abrogated, canceled and set aside, and [MSRC] is hereby released and discharged from the obligation set forth in said contract, of erecting a passenger station to cost not less than Four Thousand (4,000) Dollars, or of contributing the sum of Four Thousand (4,000) Dollars toward the erection by . . . [CCLC] of a passenger station on the hereinbefore described parcel of land designated as Parcel "B"; and the said [MSRC], as is evidenced by its acceptance of this conveyance, hereby releases [CCLC] from any obli-

gation ... to erect or cause to be erected the passenger station aforesaid."

■ As the cases just reviewed demonstrate, and as appellees and the CFC acknowledge, we have consistently construed conveyances of rights-of-way to railroads as easements and not estates in fee simple. The use of the term "right of way," however, does not *ipso facto* create an easement; rather the language of the deed must be viewed as a whole in the context of the entire transaction. As explained next, we believe that the express language of the deed in light of the circumstances makes sufficiently clear the intention of the land company and the railroad to create an easement. *See Desch v. Knox,* 253 Md. 307, 310–11, 252 A.2d 815, 817 (1969)(holding deed conveyed "right-of-way" based on the language of the deed); *Fedder v. Component Struct. Corp.,* 23 Md.App. 375, 380, 329 A.2d 56, 60 (1974)(holding that the "intention of the parties [to convey an easement was] crystal clear" when deed conveyed a "right-of-way" and "[w]hen the simple language of the contract is considered in the surrounding circumstances.") We first examine the language of the deed itself and only then turn to the circumstances of the conveyance.

### 2.

Initially, we note what is obvious about the deed. The granting clause does not state that a piece of land is being conveyed nor does it provide any indication that an estate in fee simple was intended to be conveyed. The language "free and perpetual" sheds no light on whether a nonpossessory or possessory interest is being conveyed, since an estate in fee or an easement may be "free and perpetual." *See* Md.Code (1974, 1996 Repl.Vol.), Real Property Art., § 4–105 ("[E]very grant or reservation of an easement passes or reserves an easement in perpetuity."). Rather, the granting clause of the deed directly conveys a "right of way." The appellees therefore have a high hurdle to overcome in order to demonstrate that the term right-of-way was used "in [the] unusual sense ... [of] an absolute purchase of the fee-simple of lands...."

2 ELLIOTT ON RAILROADS § 1158, at 628 n. 77 (3d ed.1907)(quoting *Williams*, 5 N.W. at 484).

That hurdle is elevated upon further examination and a contrasting of the deed's dual granting clauses. The two granting clauses each declare the land company's intent to "hereby grant and convey." First, the land company conveyed "a free and perpetual *right of way*, one hundred (100) feet wide, over the land and premises hereinafter designated as 'Parcel A.'" Second, the land company conveyed to MSRC "in fee simple, the land and premises, hereinafter designated as 'Parcel B.'" Appellees contend that because each clause contains the word "grant" the land company intended to pass an estate in fee simple even though the first clause grants a "right of way" while the second clause conveys the "land and premises" in "fee simple." The CFC concluded that the use of the term "fee simple" in reference to Parcel B merely referenced duration of the estate conveyed and not the estate itself. *Chevy Chase Land Co. of Montgomery*, 37 Fed.Cl. at 571. Relying in part on extrinsic evidence, the CFC concluded that the language "fee simple" in reference to Parcel B was synonymous with the term "perpetual" in reference to Parcel A and thus both granting clauses conveyed estates in fee. *Id.*

We believe that the CFC's and appellees' construction of the deed is overly strained. If the land company intended to convey estates in fee over both parcels, it would have been unnecessary to include two separate granting clauses. Moreover, given that two granting clauses were used, if they had intended to convey the same interest, we believe the author of the deed would have used the same language. Neither the CFC nor appellees explain why different language was used if the intent was to convey the same interest in both parcels. To hold that both Parcel A and Parcel B conveyed estates in fee would be to ignore what we believe is self-evident from the deed: that the parties intended to convey different interests, one for the "right of way" designated as Parcel A and the other for "the land and premises" in "fee simple" and designated as Parcel B. If the intent was to convey Parcel A as an estate in fee, no drafting hurdles would have prevented mak-

ing such intent explicit. *Cf. United States v. 1.44 Acres of Land, Etc., Montgomery County, Md.,* 304 F.Supp. 1063, 1071 (D.Md.1969)(applying Maryland law)("[A] legal draftsman ... would not use such [right-of-way] language to convey a fee title to a railroad.").

Appellees further attempt to bootstrap the description of Parcel A as a "parcel of land" into the granting clause to show that an estate in fee of the right-of-way was intended to be conveyed. As noted above, the description of Parcel A is found in a separate paragraph of the deed, which summarizes Parcel A as a "parcel of land ... being a strip of land fifty (50) feet wide on each side of the center line of the Metropolitan Southern Railroad through the land of [t]he Chevy Chase Land Company."

■ We disagree as to the implications of the language "parcel of land" in the description of "Parcel A" in the deed. The language is used in the portion of the deed establishing the *location* of the right-of-way, not the interest granted. Language used in a descriptive clause is less important than the language of the granting clause in denoting what interest in land is conveyed by a deed. *See Marden,* 115 Md. at 209, 80 A. at 959 (observing that, when determining the interest conveyed by a deed, in the case of conflict the granting clause generally prevails over the habendum clause). Indeed, the granting clause for Parcel B explicitly stated that what was being conveyed was "the land and premises" while the disputed grant was of a "right of way ... *over* the land and premises." (Emphasis added). Furthermore, as discussed next, in previous cases we have construed language similar to the "parcel of land" language upon which appellees rely. In these cases the deed language was found not in a descriptive clause but in the granting clause itself, and we nevertheless found that the deed conveyed an easement in lieu of the reference to the interest as a "right-of-way."

In *Green,* the deed was entitled a "Right of Way Deed." 230 Md. at 447–48, 187 A.2d at 677. The granting clause conveyed in fee simple " 'the free and uninterrupted use,

liberty and privilege of, and passageway in and along a certain right of way....'" Despite the reference to the grant in "fee simple," we concluded based on the entire instrument and the circumstances of the transaction that the deed granted an easement only, "with the fee remaining in the original grantor, his heirs and assigns." *Green*, 230 Md. at 448, 187 A.2d at 677.

Another example is *East Wash. Railway v. Brooke*, 244 Md. 287, 223 A.2d 599 (1966). In that case, the granting clause of the deed conveyed a " '*strip of land* for a right of way through said lands.'" *Brooke*, 244 Md. at 293, 223 A.2d at 603 (emphasis added). A description of the strip of land summarized it as being " 'land sixty feet in width ... as now located and used *for railroad purposes.*'" *Brooke*, 244 Md. at 294, 223 A.2d at 603 (emphasis in original). Even though the granting clause conveyed a "strip of land" (which seems synonymous with "parcel of land"), we concluded that "[i]t is plain that the conveyance was of an easement for railway purposes and use only." *Id.*

A final example is *D.C. Transit I, supra.* In that case, the deed we interpreted " 'grant[ed] and convey[ed] ... all the piece or parcel of land' " described in the deed. *D.C. Transit I*, 259 Md. at 679, 270 A.2d at 795. The habendum clause stated as follows:

> " 'To have and hold the same unto and to the use of ... [the railroad company] *for a right of way* and such other purposes as said Railway Company is authorized under its act of incorporation ... and the General Incorporation Law of this State to acquire, dispose of or deal in real estate.' " (Emphasis in original.)

*D.C. Transit I*, 259 Md. at 680, 270 A.2d at 795. The granting clause thus conveyed "*all* the piece or parcel of land" (emphasis added) with the only reference to the "right-of-way" being in the habendum and not the granting clause. Moreover, the deed explicitly stated that the right-of-way could be used for purposes for which the railroad company was authorized under the law, and the deed itself noted that such authorization

included the acquisition and disposal of real estate. Nevertheless, we concluded based on the deed language and the circumstances that the parties intended to convey an easement only. We observed that the statute authorizing the railroad to acquire and dispose of real estate was for the purpose of "laying out town sites, erecting buildings and opening and working quarries" and "a strip of land 80 feet wide is hardly a town site . . . . [and] is an unlikely place for the erection of buildings of consequence." *D.C. Transit I*, 259 Md. at 688, 270 A.2d at 800. Moreover, we observed that the use of the term "right of way" in the habendum clause was "obviously intended to have some meaning [and] makes clear the intent of the parties to grant an easement." *D.C. Transit I*, 259 Md. at 689, 270 A.2d at 800.

That the deed in this case conveys an easement and not an estate in fee follows, *a fortiori*, from *Green, Brooke,* and *D.C. Transit I*. Unlike *Green*, in the instant case there is no express language suggesting that the right-of-way was conveyed in "fee simple" (even though Parcel B was conveyed "in fee simple"). Furthermore, we do not see any legally significant difference between the "strip of land" in *Brooke* and the "parcel of land" in this case, and, unlike the instant case where the express grant was of a "right of way," the grant in *Brooke* was expressly of a "strip of land." Therefore, the deed in *Brooke* provided a much stronger reason under appellees' analysis to conclude that an estate in fee simple was conveyed rather than a servitude. We nevertheless found it "plain" in *Brooke* that the grant conveyed an easement only.

Finally, that the 1911 deed conveyed an easement seems compelled by our holding in *D.C. Transit I*, where the granting clause conveyed "all the piece or parcel of land" and the only reference to a right-of-way was in the deed's habendum clause. The deed in the instant case contains nearly identical language as in *D.C. Transit I* ("right of way" and "parcel of land"), but it more clearly indicates an easement was granted than *D.C. Transit I* since the granting clause directly conveys a right-of-way and the only reference to a "parcel of land" is in the descriptive clause—the opposite locations in which the

phrases were used in the deed at issue in *D.C. Transit I.*
Therefore we find unconvincing appellees' creative attempt to
argue that, given the definition of Parcel A as a "parcel of
land" in the descriptive clause, the "right of way" in the
granting clause refers not to the legal right to use the land but
rather to the strip of land itself.

3.

The circumstances and positions of the parties to the 1911
deed confirm that the deed conveyed an easement and not an
interest in fee simple absolute. Both the CFC and appellees
emphasize the lack of conditional language in the 1911 deed
restricting the uses of the right-of-way or setting forth its
purposes. *Chevy Chase Land Co. of Montgomery,* 37 Fed.Cl.
at 569 (emphasizing "the outright grant of the right-of-way
and the absence of purpose limitations"). They argue that the
lack of conditional language in the 1911 deed is what distin-
guishes the term "right-of-way" in that deed from the rights of
way in the numerous Maryland cases that were construed to
be easements. For example, the CFC stated that "[t]he 1911
deed does not even refer to the word 'railroad,' let alone
restrict the use of the land to railroad purposes." *Chevy
Chase Land Co. of Montgomery,* 37 Fed.Cl. at 571. Turning
to evidence extrinsic to the deed, the CFC supported its
conclusion by quoting from other deeds executed by the land
company to railroad companies that conveyed easements
which contained purpose language. *Chevy Chase Land Co. of
Montgomery,* 37 Fed.Cl. at 570. For example, the court
quotes from a deed stating that the "right-of-way" is subject
to the railroad "construct[ing] and complet[ing] and com-
menc[ing] regular operat[ions] within nine months" and anoth-
er deed conveying a "right of way for the purpose of con-
structing and operating the railroad." *Id.*

While the CFC and appellees correctly point out that there
are no purpose limitations in the 1911 deed, they entirely
overlook the fact that the railway for which the conveyance
was executed had already been built and was in operation for
nearly 20 years prior to the 1911 conveyance. Thus, unlike

the right-of-way deeds examined in our prior cases, and unlike the land company's deeds to other railroads, the 1911 deed did not convey an undeveloped railroad corridor but rather a railway that had been in existence for quite some time. As a result, there was little need to state in the deed the purposes for which the right-of-way was conveyed. Regardless, contrary to the intimations of appellees and the CFC, our prior cases have never stated that a right-of-way deed must include purpose language. Rather, we have looked to the circumstances and positions of the parties. In this case, the fact that both parties to the deed were well aware that the right-of-way was to be used for a freight and passenger railroad that had been in operation for many years overcomes any need for limiting language in the deed itself for purposes of creating an easement as opposed to an estate in fee simple absolute.

Furthermore, construing the deed to convey an easement is consistent with the 1891 agreement between the land company and the railroad. That agreement was made "in contemplat[ion of] the construction of a line of road . . . to traverse the property" of the land company. It further explained the land company's intention "to donate and convey to the said railroad company a right of way 100 feet wide." [5] The 1891 agreement also required the railroad to construct a passenger and freight depot on the tract of land that in the 1911 deed was denoted as "Parcel B," or, if the railroad did not construct the depot, the agreement provided that it would contribute $4,000 toward

---

**5.** In pertinent part, the 1891 agreement between the railroad and the land company stated:

"the said Chevy Chase Land Company in consideration of the agreement of the said railroad company hereinafter set forth, agrees to donate and convey to the said railroad company a right of way 100 feet wide. . . .
[a metes and bounds description] * * *
the above described parcel being a strip of land fifty feet wide on each side of the centre line of the [MSRC] through the lands of [the land company].
And the said Land Company . . . further agrees to donate and convey to the said Railroad Company for the purposes of a passenger and freight depot, and uses incident thereto, including side tracking, the following described parcel of land [a metes and bounds description]."

the cost of the land company's construction of the depot. The agreement was never recorded. After the agreement, the railroad constructed the railway but it never built the passenger and freight depot on Parcel B. The CFC concluded that "it is fairly clear that [the 1891 agreement] contemplated the conveyance of an easement." *Chevy Chase Land Co. of Montgomery,* 37 Fed.Cl. at 572.

Despite its conclusion that the 1891 agreement contemplated an easement, the CFC considered extrinsic evidence to conclude that the 1911 deed conveyed an interest in fee simple absolute. The CFC relied on a 1910 letter from a land company official referencing the conveyance to occur in the next year. The letter stated that

> " 'the arrangement was that the Baltimore and Ohio Railroad Company pay to the Chevy Chase Land Company Four Thousand Dollars in cash, and in consideration of this payment, have conveyed to it, *all the property covered by its right of way contract* with the Land Company, entered into some years ago.' " (Emphasis added).

*Chevy Chase Land Co. of Montgomery,* 37 Fed.Cl. at 572. The CFC concluded that the letter "indicates" that the 1911 conveyance was to involve estates in land and not an easement. *Id.*

Even assuming, *arguendo,* that this letter was properly used to construe the interest that was conveyed in the deed, we fail to see the letter's significance in determining whether the right-of-way in the 1911 deed conveyed an estate or an easement. The use of the language in the letter "all the property" is no more convincing as to intent to convey in fee simple than appellees' arguments rejected earlier relating to the description of the right-of-way as a "parcel of land." As we see it, the letter has less significance than the language in the deed describing Parcel A as a "parcel of land." The letter's statement of intent to "convey[ ] all the property covered by its right of way contract" can be interpreted as an intent to convey an easement just as convincingly as it may be

interpreted to show an intent to convey an estate in fee simple absolute.

Appellees contend that the 1891 agreement should not be considered because it was "mutually abrogated, canceled and set aside" in the 1911 deed. Indeed, as discussed above, we need not turn to the 1891 agreement to reach our conclusion that an easement was conveyed in the 1911 deed. However, the abrogation language of the 1911 deed was "in consideration of the execution and delivery" of the new deed. Thus, it is relevant to the 1911 deed since it supplied consideration for the transaction. Moreover, the relevant portion of the deed states in full that the 1891 agreement is

> "mutually abrogated, canceled and set aside, *and* [MSRC] is hereby released and discharged from the obligation set forth in said contract, of erecting a passenger station to cost not less than Four Thousand (4,000) Dollars, or of contributing the sum of Four Thousand (4,000) Dollars toward the erection by ... [CCLC] of a passenger station [on Parcel B]; and [MSRC], *as is evidenced by its acceptance of this conveyance,* hereby releases [CCLC] from any obligation ... to erect or cause to be erected the passenger station aforesaid." (Emphasis added).

Thus, the 1891 agreement was abrogated only when the 1911 deed was properly executed and delivered, and that abrogation was linked in express contractual terms to the primary outstanding obligation of the 1891 agreement—to either spend $4,000 on a passenger depot or pay $4,000 to MSRC for its own construction of a passenger depot.

 This leads to an additional factor that courts consider in determining whether a fee simple estate or an easement is granted by a deed conveying a "right-of-way"—the amount of consideration paid for the deed. *"Deed to Railroad Company as Conveying Fee or Easement,"* Annotation, 6 A.L.R.3d 973, § 3, at 1038 (1966)("A factor which might be considered relevant in determining whether a deed to a railroad company should be construed as conveying a fee or easement is the amount of the consideration shown to have been paid by the

company for the conveyance in question."). "The fact that the consideration paid was less than the value of a fee simple estate in the land, weighs strongly in favor of finding that they intended an easement." RESTATEMENT (THIRD) OF PROPERTY § 2.2, "Intent to Create a Servitude" cmt. g (Tentative Draft No. 1, 1989). We applied this principle in *Hodges, supra,* where we found that a deed to a railroad conveyed an easement. We noted that "[t]he purpose of the grantee was the building of a railroad, in which the grantor was willing to co-operate with the grantee *by a gift of this piece of right of way." Hodges,* 178 Md. at 304, 13 A.2d at 340 (emphasis added). *See also Tamalpais Land & Water Co. v. Northwestern Pac. R. Co.,* 73 Cal.App.2d 917, 167 P.2d 825, 830 (1946)("[T]he fact that no monetary consideration, or only nominal monetary consideration was paid for the grant is a factor of considerable importance indicating that the grant conveys an easement and not a limited fee."); *Weeks v. Missouri Pacific Railroad Company,* 505 S.W.2d 33, 37–38 (Mo.1974)(finding that deed conveyed an easement interest based in part on evidence that defendant paid no consideration for the grant).

Appellees argue unconvincingly that the $4,000 the railroad paid to the land company was for an estate in fee simple of the land occupied by the right-of-way and not for release from the obligation in the 1891 agreement to expend or pay that amount for the construction of a passenger depot. They go on to contend that the $4,000 for Parcels A and B was more than nominal consideration, which they argue demonstrates that the deed conveyed an estate in fee simple. The CFC apparently accepted appellees' arguments, finding "more than nominal consideration," but it went on to conclude that the "consideration tendered does not militate in either direction." *Chevy Chase Land Co. of Montgomery,* 37 Fed.Cl. at 573–74. We disagree that the consideration was more than nominal and believe the lack of more than nominal consideration further militates toward construing the deed to convey an easement.

We must look no further than the deed itself to see that the consideration paid was nominal. The granting clause states

that the property conveyed by the land company was "in consideration of FOUR THOUSAND (4,000) DOLLARS." As noted above, the deed provides that "in consideration of the execution and delivery of this Deed," the land company would release MSRC from its contractual obligation to pay $4,000 for the construction or the land company's construction of a passenger depot. Thus, the railroad paid $4,000 for release of a $4,000 contractual obligation *and* the conveyances of Parcel A and Parcel B, which were promised to be conveyed in the agreement of 1891. In lieu of its outstanding $4,000 contractual obligation, the consideration the railroad paid for the property was clearly nominal, which supports our interpretation of the deed as conveying an easement. In sum, we do not believe, as the appellees intimate and the CFC apparently accepted, that it was sheer coincidence that the $4,000 the railroad paid for the 1911 deed was of the same amount as the railroad's outstanding $4,000 contractual obligation.

Finally, we are unconvinced by appellees' arguments that the Maryland statute in effect in 1911 suggests that the deed conveyed a fee simple estate. That statute declares that

"[t]he word 'grant,' the phrase 'bargain and sell,' in a deed, or any other words purporting to transfer the whole estate of the grantor shall be construed to pass to the grantee the whole interest and estate of the grantor in the lands therein mentioned, unless there be limitations or reservations showing, by implication or otherwise, a different intent."

Md.Code (1904), Art. 21, § 12. Appellees contend that the statute applies because of the use of the term "grant" in the 1911 deed. As described above, the limitations in the 1911 deed are inherent in the grant of a right-of-way to a railroad company. Thus, "there [are] limitations or reservations showing, by implication or otherwise, a different intent" than to convey the whole estate of the grantor. *Id.* Our previous cases construing deeds to railroad companies containing the term "grant" nevertheless have concluded that the instruments conveyed easements and not estates in fee, notwithstanding the statute relied on by appellees. *See Brooke,* 244 Md. at 293, 223 A.2d at 603 (noting Article 21's "principle that

the word 'grant' must be construed to pass all of the grantor's interest unless there are indications otherwise" but concluding nevertheless that deed to railroad using term "grant" conveyed an easement); *Richfield Oil Corp., supra* (refusing to apply statute to deed using term "grant" to convey a "right of way"); *Hodges,* 178 Md. at 303–04, 13 A.2d at 339–40 (refusing to apply the statute when deed used term "grant" but language showed that grantor "gave the [railroad] a right of way," which conveyed an easement); *Ross v. McGee,* 98 Md. 389, 394, 56 A. 1128, 1130 (1904)(holding that the statute "was never intended to apply to ... the granting of an easement").

### 4.

In conclusion, the use of the term "right-of-way" in the deed provides a strong indication that the railroad and the land company intended the 1911 deed to convey an easement. Our cases and the cases from other states consistently have construed deeds to railroads of "rights-of-way" as conveying easements and not estates in fee simple absolute. The language of the deed at issue in this case provides no reason to deviate from our previous cases. This is especially the case in light of the dual granting clauses of Parcel A, conveying a "right of way" and Parcel B, conveying the parcel "in fee simple." Finally, the circumstances of the deed confirm the conclusion that the deed conveyed an easement only. In particular, the fact that the railway had already been built and was in operation obviated any need for limiting language in the deed to indicate that less than a fee simple was being conveyed, and the nominal consideration given the land company by the railroad is a factor more consistent with the conveyance of an easement than an estate in fee simple absolute.[6]

---

6. We decline to entertain the Country Club's contention that it is the owner in fee simple absolute of a portion of the right-of-way that bisects two parcels of land conveyed to the Country Club by the land company in 1909. The Country Club did not argue before the United States Court of Federal Claims (CFC) that it owned in fee simple the segment now claimed. Rather, it contended that it had ownership "[p]ursuant

## III. THE SCOPE OF THE EASEMENT

Since we have determined that the 1911 deed granted an easement, we must now consider the second certified question regarding the scope of the easement. We initially determine whether the express language of the deed limits the available uses of the right-of-way. After that determination, we consider the extent to which Maryland common law on railroad easements imposes any implied limits on use of the right-of-way that would prevent the right-of-way in the instant case from being used for a hiker/biker trail. This part then concludes with an examination of whether the use of the right-of-way for a hiker/biker trail unreasonably increases the burden of the easement on the servient estates.

---

to the doctrine of adverse possession, or alternatively, lost deed." *Chevy Chase Land Co. of Montgomery v. U.S.*, 37 Fed.Cl. 545, 587 (1997). It made no claim of ownership in the right-of-way by virtue of the 1909 deed, as it does here. *See Chevy Chase Land Co. of Montgomery*, 37 Fed.Cl. at 587–88. The Country Club first made the argument that the 1909 deed conveyed to it the segment of the right-of-way in fee simple absolute to the Federal Circuit Court of Appeals; however, under its rules, that court will not entertain arguments not raised below. *See Jay v. Secretary of DHHS*, 998 F.2d 979, 983 n. 4 (Fed.Cir. 1993). Therefore, even if we were to entertain the Club's contention, that court nevertheless properly may refuse to consider that aspect of our decision in resolving the ultimate question of whether an unconstitutional taking occurred. Moreover, the certified questions to this Court do not seek an interpretation of the 1909 deed to the Country Club.

Furthermore, even if we were to entertain the Country Club's contention, the Country Club would face a difficult if not insurmountable hurdle in attempting to overcome the fact that the deed under which it claims title contains a metes and bounds description of the land that does not include any portions of the right-of-way at issue here. Even if we agreed with its contention, the Country Club's claim would ultimately be unsuccessful because our conclusions in Parts III and IV that the trail use is within the scope of the easement which has not been abandoned.

We therefore decline to exercise our discretion under Maryland Code (1974, 1998 Repl.Vol.), Courts & Judicial Proceedings Article, § 12–604, to rephrase the certified question to entertain the Country Club's argument that the 1909 deed conveyed to it a portion of the right-of-way in fee simple absolute.

## A. Interpretation of the 1911 Deed

Appellants contend that the proposed interim use of the right-of-way as a hiker/biker trail is beyond the scope of the easement. Instead of the language of the deed, appellants emphasize the circumstances at the time of the original agreement between the railroad and the land company in 1891, contending that the "evidence is clear" that the land company intended that the easement was for purposes of freight railroad only. The land company cites the *Brooke* and *D.C. Transit I* decisions as support for its view that when a right-of-way is conveyed to a railroad, it is *ipso facto* restricted to railroad uses. Appellees, on the other hand, emphasize the deed itself, which contains no express limitations on the right-of-way conveyed. They contend that the easement was for a right-of-way to be used for general transportation purposes and that its use as a recreational trail is consistent with those purposes and imposes no additional burden on the servient estates.

■ We agree with appellees that the primary consideration in construing the scope of an express easement is the language of the grant. "[T]he extent of the rights [of an easement acquired by express grant] must necessarily depend upon a proper construction of the conveyance or that part of it by which the easement was created." *Parker v. T & C Dev. Corp.,* 281 Md. 704, 709, 381 A.2d 679, 682 (1978)(quoting *Buckler,* 221 Md. at 537, 158 A.2d at 322). *See also Reid v. Washington Gas Lt. Co.,* 232 Md. 545, 549, 194 A.2d 636, 638 (1963)(stating that the "scope of the easement is to be determined from the language of the grant"); 4 POWELL ON REAL PROPERTY § 34.12[2], at 34–178 (1998 Supp.)(observing that courts interpreting easements conveyed by express grant "stress the primary control exercised by the language of the creating conveyance" (footnote omitted)).

No language in the deed in the instant case suggests that the right-of-way was limited to railroad purposes only (and much less so to *freight* railroad purposes, as the land company contends). The deed conveyed a "free and perpetual right of

way." The use of the terms "free" and "perpetual" provide a clear indication that few, if any, conditions were intended to be placed on the railroad's use of the right-of-way. "[F]ree" is defined as "[n]ot [being] subject to [the] legal constraint of another." BLACK'S LAW DICTIONARY 663 (6th ed.1990). The use of the term "perpetual" clearly indicates that the easement was intended to be of indefinite duration and, particularly when combined with the term "free," suggests that the use of the easement was to be dynamic, *i.e.,* adaptable to the evolving circumstances and transit needs of those intended to benefit from the right-of-way—in particular the general public whom the land company was attempting to attract to the areas served by the railroad. The language making the easement transferable to "successors and assigns" further supports a broad construction of the deed language.

Unlike many of the grants of easements that we have addressed in the past, the deed in the instant case does not suggest any limit on the use of the right-of-way. It is clear that a right of passage was granted, and, as noted above in Part II.C.3, the circumstances clearly indicate that the original instrumentality was a railroad. But nowhere in the granting clause or. elsewhere in the deed does the language suggest that a railroad was the only instrumentality for use of the perpetual right-of-way. For example, nowhere does language "for railroad purposes" appear, and there are no other express limitations on the use of the right-of-way. *Cf. Brooke,* 244 Md. at 294, 223 A.2d at 603 (concluding that deed language *"for railroad purposes "* limits scope of right-of-way). Even if we consider the 1891 agreement to convey the right-of-way to the railroad, that agreement includes no express limitations; it states only that the agreement was made "in contemplat[ion of] the construction of a line of road ... to traverse the property" of the land company. As the Minnesota Supreme Court observed in addressing the scope of an easement granted to a railroad:

"[N]one of the deeds expressly limit the easement to railroad purposes, provide that the interest conveyed terminates if use for railroad purposes ceases, or provide that the

easement would exist only for so long as the right-of-way was used for railroad purposes. While the grantors were undoubtedly aware that a railroad would be constructed on the land, none of the deeds limit the use to railroad purposes."

*State by Wash. Wildlife Preservation v. State,* 329 N.W.2d 543, 546 (Minn.), *cert. denied* 463 U.S. 1209, 103 S.Ct. 3540, 77 L.Ed.2d 1390 (1983). In sum, it seems undisputable that the deed sweeps broadly by conveying an interest that is "free and perpetual" and making it freely transferable to "successors and assigns."

 While the deed presents no express limitations on the use of the right-of-way, that does not end our analysis. Keeping in mind the broad language in the grant, we must determine whether the appellees have the right to substitute, at least for the interim, the use of the right-of-way as a recreational trail for the previous use of the right-of-way as a railroad corridor. We must consider whether the use of the right-of-way as a hiker/biker trail is of the same quality of use as anticipated in the original grant and whether it imposes any unreasonable new burdens on the dominant tenement. Before analyzing those questions, we note that because of the broad language of the grant any doubts about its use will be resolved in favor of the grantee, *i.e.,* the railroad:

> "If the grant contains no limitations, the court will attempt to discern what the parties would have reasonably expected, and will usually be generous in its interpretation. The language of the easement can grant to the easement holder a good deal of discretion in the use of the easement or limit the use very narrowly; if the grant is not clear, the court will interpret the scope of the easement in favor of 'free and untrammeled use of the land.'" (Footnotes and citations omitted).

7 Thompson on Real Property § 60.04(a), at 451 (Thomas ed.1994). *See also Washington Gas Lt. Co.,* 232 Md. at 549, 194 A.2d at 638 ("[T]he scope of the easement is to be

determined from the language of the grant and any doubtful language must be resolved in favor of the grantee.").[7]

### B. Public Transit Use of the Right–of–Way

We have long accepted the view that railroads are public service corporations. *Whalen v. Balto. & Ohio R. Co.,* 108 Md. 11, 21, 69 A. 390, 393 (1908). *See also Ma. & Pa. RR. Co.,* 224 Md. at 39, 166 A.2d at 250 (referring to a railroad as a "*quasi*-public corporation"); *Read v. Montgomery County,* 101 Md.App. 62, 68, 643 A.2d 476, 479 (observing that railroads operating the Georgetown Branch "function[ ] to promote the public welfare"), *cert. denied,* 336 Md. 301, 648 A.2d 203 (1994). In *Whalen,* we accepted the notion that a railroad is " 'obliged to use its powers and privileges for the benefit of the public, and in aid of the public good.' " 108 Md. at 21, 69 A. at 393 (quoting the appellant's brief). Indeed, as the CFC acknowledged, the statutes in place at the time of the conveyance did not restrict railroad corporations to conducting rail service only. *See Chevy Chase Land Co. of Montgomery,* 37 Fed.Cl. at 585–86. For example, Maryland law empowered the legislature to "regulate, modify or change the control, use

---

7. We disagree with the land company that our decisions in *East Wash. Railway v. Brooke,* 244 Md. 287, 223 A.2d 599 (1966), *D.C. Transit Systems v. S.R. C.,* 259 Md. 675, 270 A.2d 793 (1970)(*D.C. Transit I* ) and *D.C. Transit v. State Rds. Comm'n,* 265 Md. 622, 290 A.2d 807 (1972)(*D.C. Transit II* ), that hold that the conveyance of a "right of way" to a railroad automatically indicates that the easement is restricted to railroad purposes only. In *Brooke,* in quoting the granting clause we emphasized (by use of italics) the language *"for railroad purposes."* 244 Md. at 294, 223 A.2d at 603. The deed in the instant case includes no such limiting language. Moreover, the issue decided in that case was not related to the scope of the easement, but whether a fee simple or an easement had been conveyed. In *D.C. Transit I* and *D.C. Transit II* the scope of the easement was not at issue. Rather, *D.C. Transit I* raised the issue of whether a grant to a railroad conveyed a fee simple or easement in the land, and *D.C. Transit II* involved whether the easement had been abandoned. While there is some language observing that the use of the easement was for a railroad, whether the use was so limited was not raised. Regardless, the deed in issue in the *D.C. Transit* cases expressly limited the easement to the purposes of the railroad's charter. We therefore disagree with the land company as to the applicability of these cases.

and estate of any rail road constructed by such corporation, in such manner as it may deem equitable towards the said corporation and *necessary to the accommodation of the public travel or use of the said rail road or rail roads."* Md.Code (1860), Corporations Art., § 71 (emphasis added). *See also* Chapter 231 § 1 of the Act of 1882 (authorizing railroad to engage in telegraph business); Ch. 279 of the Acts of 1880 (railroad authorized to operate other railroads and works facilitating commerce). Because the public nature of the railroad business was obvious at the time of the 1911 deed, we must assume that the land company knew that its grant was subject to reasonable accommodations for the public use and that, if it wanted to limit the uses of the right-of-way to rail use only, it would have included appropriate limiting language in its deed.

We have long considered a railroad line as analogous to a public highway. *Whalen,* 108 Md. at 21, 69 A. at 393 ("A railroad is in many essential respects a public highway, and the rules of law applicable to one are generally applicable to the other."); *Hessey v. Capital Transit Co.,* 193 Md. 265, 272, 66 A.2d 787, 790 (1949)(observing that "a railroad company, organized and conducted for private corporate profit, . . . devot[es] its property to the use of the public"). Just like highways, railroad lines are subject to public use as is evidenced by their common carrier obligations. And railroads historically have had the power of eminent domain, a power reserved only to the government and those the government has annointed. Thus, our cases interpreting the scope of public highways provide a solid framework upon which to construe the grant of a general use "right-of-way" to a railroad.

Our highway cases have construed easements for public highways as including within their scope changing means of transportation. In *Baltimore County Water & Electric Co. v. Dubreuil,* 105 Md. 424, 66 A. 439 (1907), we explained that "we have been governed by the fact that such [electric railway] uses, of both streets and rural highways, were only new modes of travel and transportation, and the right,

originally acquired, to use them was not simply for the then existing modes, but for all such as might arise in the ordinary course of improvement. It could therefore be presumed that such improved modes of travel and transportation were within the contemplation of the parties. . . ."

105 Md. at 431, 66 A. at 441. About a decade earlier, in *Poole v. Falls Road Electric Ry. Co.*, 88 Md. 533, 41 A. 1069 (1898), we noted that the purpose of a highway easement is for "passing and repassing" and only when a use is "not incident to such right of passage" does it create an additional servitude. 88 Md. at 537, 41 A. at 1071. We therefore concluded that the

"test . . . of what is a new use would seem to be found not necessarily in the nature of the structure nor in the number of the tracks but in the use itself; whether it is promotive of the objects and purposes for which the easement in the public was acquired."

*Id. See also* 5 RESTATEMENT OF PROPERTY § 484 (1944)("In ascertaining . . . whether additional or different uses of the servient tenement required by changes in the character of the use of the dominant tenement are permitted, the interpreter is warranted in assuming that the parties to the conveyance contemplated a normal development of the use of the dominant tenement.").

The early decisions of this state adhere to the view that the purpose for which the public easement was acquired is the overriding factor in the analysis rather than the mode or instrumentality of use. In *Peddicord v. B., C. & E.M.R.R. Co.*, 34 Md. 463 (1871), we held that a right-of-way conveyed to a turnpike company could be used for a horse railway for passengers even though "it was not actually contemplated by any of the parties to the acquisition and grant." 34 Md. at 480–81. We recognized that the turnpike company had a perpetual easement over the highway, lasting "forever," and we observed that its conversion to a horse railway was an appropriate improvement "consistent with its character and purpose as a public highway." *Id.* Further, we concluded

that the conversion to horse railway did not cause an additional burden on the land or operate to impair the incidental rights of the dominant tenement. *Id.* *See also Hodges v. Balto. Union P. Ry. Co.,* 58 Md. 603, 619 (1882)(similarly holding that a "horse railway is but one of the legitimate contingencies within the objects and purposes for which the street was dedicated to the public"). In *Koch v. North-Ave. R.R. Co.,* 75 Md. 222, 23 A. 463 (1892) and *Green v. City & Suburban R.R. Co.,* 78 Md. 294, 28 A. 626 (1894), we extended the holdings in *Hodges* and *Peddicord* to electric railways, concluding that electricity was a normal development consistent with the purpose of public travel. *See also Lonaconing Ry. Co. v. Consol. Coal Co.,* 95 Md. 630, 53 A. 420 (1902)(holding that the owner of the fee of a country road was not entitled to an injunction to prevent the building of an electric railway in the county because it was not an additional servitude).

In this regard, the law in Maryland is consistent with the law of other jurisdictions that recognize the public attributes of railroad lines. As the West Virginia Supreme Court of Appeals has observed,

"railroads are not viewed strictly as private corporations since they are publicly regulated common carriers. Essentially, a railroad is a highway dedicated to the public use. This dedication imports to the railroad the status of a quasi-public corporation. *Eckington & Soldier's [Soldiers'] Home R. Co. v. McDevitt,* 191 U.S. 103, 24 S.Ct. 36, 48 L.Ed. 112 (1903); *United States v. Trans–Missouri Freight Assoc.,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). As such, the rights and duties of a railroad are in most instances determined by constant consultation with the public interest."

*Marthens v. B & O Railroad Co.,* 170 W.Va. 33, 289 S.E.2d 706, 711 (1982). *See also State by Wash. Wildlife Preservation,* 329 N.W.2d at 546 (quoting *Marthens* ); *Lawson v. State,* 107 Wash.2d 444, 730 P.2d 1308, 1311 (1986)("[R]ailroads must hold their property in trust for the public use."); *id.* ("A railroad is a public highway, created for public purposes.");

*Faus v. City of Los Angeles,* 67 Cal.2d 350, 62 Cal.Rptr. 193, 431 P.2d 849, 856 (1967)(holding that right of way "primarily intended to provide public transportation" that was initially used for electric railroad could be converted to motor bus transportation).

### C. Compatibility of Trail Use with Prior Uses

 As discussed above, the starting point for determining whether the current use of the Georgetown Branch as a hiker/biker trail is compatible with its prior use is the deed itself. The phrase "right-of-way" as used in the context of the grant is a "right belonging to a party to pass over land of another." BLACK'S LAW DICTIONARY 1326 (6th ed.1990). Since the deed contains no limits on the use of the right-of-way, we apply the rule that "[a] grant in general terms of an easement of way will ordinarily be construed as creating a general right of way capable of use in connection with the dominant tenement for all reasonable purposes." 3 HERBERT THORNDIKE TIFFANY, THE LAW OF REAL PROPERTY § 803, at 322 (3d ed.1939)(footnote omitted).

 We believe it indisputable that use of the right-of-way as a trail is consistent with its essential nature relating to the "pass[ing] over land of another" and is a reasonable use of a general right of way. Accordingly, the scope of the right-of-way in the instant case encompasses use as a hiker/biker trail. It follows from our cases that the fact that a recreational trail may not have been actually contemplated by the parties when the deed was conveyed in 1911 is not outcome determinative. Rather, we assume that the parties anticipated that the use of the right-of-way would conform over time to the reasonable demands of the public. Just like the highway easement in *Peddicord* lasted "forever," the deed in this case was made "perpetual," and although use as a hiker/biker trail "was not actually contemplated by any of the parties to the acquisition and grant, . . . it may be said to have been within the legal contemplation of all that it was to be used for all purposes by which the object of its creation, as a public highway, could be promoted." *Peddicord,* 34 Md. at 480–81. In other words,

the use of the right-of-way as a public trail was legally contemplated by the parties to the 1911 deed and is of the same nature as the public railway in existence for some 90 years, *i.e.,* the use involves the passage over land consistent with the needs of the public. The 1891 contract and 1911 deed both clearly anticipated that the right-of-way would be put to use for public transportation, as evidenced by the plans to build a "passenger station" (the 1911 deed) or a "freight and passenger depot" (the 1891 agreement).

Use of the right-of-way as a hiker/biker trail constitutes a change in instrumentality consistent with the essential purpose anticipated at the time of the original grant in 1911—passage through Silver Spring, Chevy Chase, and Bethesda. The primary change is one of instrumentality from railcars to bikes and walking, and our highway cases make clear that changes in mode of use are presumed to be within the contemplation of the parties. Indeed, the state legislature has seen fit to define "highway" as including "bicycle and walking paths." Md.Code (1977, 1993 Repl.Vol., 1998 Supp.), Transportation Art., § 8–101(i)(1). *See also* the cases cited in Part III.B., *supra,* and *Washington Gas Lt. Co.,* 232 Md. at 551, 194 A.2d at 639 (holding that the replacement of an existing pipe to a larger pipe was within the scope of the easement because the change "involved merely an alteration of the *instrumentality* of the easement")(emphasis in original); *Tong v. Feldman,* 152 Md. 398, 136 A. 822 (1927)(similar holding). As the South Dakota Supreme Court stated, "the Railroad has transferred the right-of-way to the State for use as a public highway. Hikers, bikers, skiers, and snowmobilers will use the right-of-way, and, as such, the right-of-way will continue to be used as a public highway compatible and consistent with its prior use as a public railway." *Barney v. Burlington Northern R. Co.,* 490 N.W.2d 726, 732 (S.D.1992), *cert. denied sub nom. Kaubisch v. South Dakota,* 507 U.S. 914, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993).

### D. The Reasonableness of the Burden

We must next consider whether use of the right-of-way as a hiker/biker trail unreasonably increases the bur-

den on the underlying fee simple estates. It is "the generally accepted rule that since an easement is a restriction upon the rights of the servient property owner, no alteration can be made by the owner of the dominant estate which would increase such restriction except by mutual consent of both parties." *Washington Gas Lt. Co.*, 232 Md. at 548–49, 194 A.2d at 638. *See also W. Arlington L. Co. v. Flannery*, 115 Md. 274, 279, 80 A. 965, 967 (1911)("[B]ecause an easement is a restriction upon the rights of property of the owner of the servient estate . . . no alteration can be made by the owner of the dominant estate, which would be to increase such restriction."). As we explained in *Washington Gas Lt. Co.*, the test used to determine whether the restriction on the servient estate, *i.e.*, the burden imposed, is

> "whether the change is so substantial as to result in the creation and substitution of a different servitude from that which previously existed. In other words, if the alteration is merely one of quality and not substance there will be no resulting surcharge to the servient estate." (Citation omitted).

*Washington Gas Lt. Co.*, 232 Md. at 549, 194 A.2d at 638.

▪▪▪ It is self-evident that the use of the right-of-way as a transportation corridor for walking, biking, and other transportation purposes, including its possible use in the future for light rail, imposes no new burdens on the servient tenements and does not result in the "substitution of a different servitude from that which previously existed." *Id.* The use to which the County proposes to use the right-of-way is reasonable and consistent with a grant of a right-of-way "in general terms." *See* 3 HERBERT THORNDIKE TIFFANY, THE LAW OF REAL PROPERTY § 803, at 322 (3d ed.1939). Indeed, "[r]ecreational trail use of the land is compatible and consistent with its prior use as a rail line, and imposes no greater burden on the servient estates." *State by Wash. Wildlife Preservation*, 329 N.W.2d at 547.

In comparison to our public highway cases that have permitted a change in use from a highway to a horse or an electric

railway, the change of use proposed in the instant case is considerably less burdensome. That use of the right-of-way by bikers and walkers poses less of a burden than the use required by a freight train is obvious. Bikers and walkers, even in large groups, simply cannot be said to be more burdensome than locomotive engines pulling truck-sized railroad cars through the corridor. "The legitimate burden presented by frequent, loud, and even dangerous, railroad use far outstrips any burden presented by foot or bicycle traffic." *Lawson,* 730 P.2d at 1320 (Utter, J., dissenting). *See also Barney,* 490 N.W.2d at 733 (observing that conversion from railway to recreational trail poses "[n]o greater burden . . . on the servient estate.") Moreover, the conversion from a railway to a trail is consistent with the general rule of property law that easements are non-exclusive. *Wagner v. Doehring,* 315 Md. 97, 104, 553 A.2d 684, 687 (1989)("[T]he holder of a right-of-way does not ordinarily have exclusive use of the way."). On the other hand, an easement held by a railroad tends to exclude use of the easement by the owner of the servient tenement. *See, e.g., State v. Preseault,* 163 Vt. 38, 652 A.2d 1001, 1003 (1994)("[T]he holder of a railroad easement enjoys the right to the exclusive occupancy of the land, and has the right to exclude all concurrent occupancy in any mode and for any purpose."); *State ex rel. Fogle v. Richley,* 55 Ohio St.2d 142, 378 N.E.2d 472, 475 (1978)("There can be no greater burden upon property than that which results from [a railroad's] appropriation of a right to exclusive use."); *Missouri–Kansas–Texas Railroad Company v. Freer,* 321 S.W.2d 731, 737 (Mo.Ct.App.1958)("[S]omewhat as a matter of public policy, the holder of a railway right of way easement can . . . exclude the owner of the servient tenement.")(footnote omitted). Thus, the change in use in this case actually decreases the burden on the servient tenement because, *inter alia,* the shift is from an exclusive to a non-exclusive use. In this case, the owners of the underlying fee estates with property abutting the Georgetown Branch have access to a corridor to which they did not have access prior to conversion to a trail. *See also* Marc A. Sennewald, *The Nexus of Federal and State*

*Law in Railroad Abandonments,* 51 VAND. L.REV. 1399, 1411 (1998)(observing that railroad right-of-ways are "exclusive use easement[s]" and that "railroad easements are among the most burdensome of easements, especially as compared to easements used for interim recreational trails"); Charles H. Montange, *Conserving Rail Corridors,* 9 TEMP ENVTL. L. & TECH. J. 139, 158 (1991)(contending that the shift in use "from a burdensome form of public highway—rail—into a less burdensome form—trail" is *"de minimis ")*(footnote omitted).

The fact that the right-of-way may be used for recreational as well as transportation purposes has no bearing on our analysis, since the "recreation" involved—biking and hiking—consists of the enjoyment one may have in transporting oneself. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2430 (Unabridged ed., 1986)(defining "transportation" as involving "travel from one place to another"). Indeed, that hiking and biking may be recreational in addition to fulfilling transportation needs is not all that different from the enjoyment that some derive from driving a car or even riding a train; the enjoyment that some derive from those activities does not detract from their essential character as transportation-related. Indeed, by the very nature of the right-of-way—a confined, narrow strip of land—the "recreational" use is limited to those uses involving *transportation* itself, including biking, running, and walking, each of which involves moving from one place to another. *Cf. D.C. Transit I,* 259 Md. at 688, 270 A.2d at 800 (observing that the useful purpose of "a strip of land 80 feet wide" is limited); *Ma. & Pa. RR.,* 224 Md. at 36–37, 166 A.2d at 248–50 (making a similar observation).

### E. Conclusion

The right-of-way in the instant case is affected by the public interest. That railroad companies are in the nature public service corporations has been a constant theme of statutory and case law, and we have recognized the public nature of such easements in our jurisprudence regarding the scope of public easements well before the conveyance of the deed in the instant case. *See* Part III.B., *supra.* The public policies have

been evidenced by the comprehensive federal regulatory scheme that governs many aspects of the railroad business (*see* Part IV. A.2, *infra* ), by a railroad's status as a common carrier, and by state regulation, even at the time the right-of-way was deeded to the railroad in this case. *See generally Benson v. Public Service Comm.,* 141 Md. 398, 118 A. 852 (1922).

Federal and state laws explicitly recognize the value to the general public of railroad rights-of-way. The federal Rails-to-Trails Act, which serves as the impetus for this lawsuit, is an obvious example of the perceived public value of railroad corridors. *See* 16 U.S.C. § 1247(d); *Preseault,* 494 U.S. at 18, 110 S.Ct. at 925, 108 L.Ed.2d at 17 (quoting H.R. REP. No. 98–28, at 8 (1983) U.S.Code Cong. & Admin. News 1983 at 112, 119)(upholding the Act as a legitimate exercise of congressional power and observing that "Congress intended 'to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use' "). The Maryland legislature has also recognized the public value of railroad rights-of-way. *See* Md.Code (1974, 1997 Repl.Vol.) Natural Resources Art., § 5–1010(a)(2)("Abandoned railroad corridor property is a unique source of land corridors that are, in many cases, suitable for recreational trails."); Md.Code (1977, 1993 Repl.Vol.), Transportation Art., § 7–901 (authorizing the state to acquire railroad corridor property). Thus, our holding furthers, rather than frustrates, legitimate state and federal policy interests.

Our conclusion here also is consistent with the decisions of courts in other states that have held that trail use falls within the scope of the right-of-way conveyed to the railroad. As the Supreme Court observed in *Preseault,* some rights of way "are held as easements that do not even as a matter of state law revert upon interim use as nature trails." 494 U.S. at 16, 110 S.Ct. at 924, 108 L.Ed.2d at 16 (citation omitted). For example, in *State by Wash. Wildlife Preservation, supra,* the Minnesota Supreme Court construed a grant of a right-of-way to a railroad that included no express limitations. The court

concluded that "[u]se of the right-of-way as a recreational trail is consistent with the purpose for which the easement was originally acquired, public travel, and it imposes no additional burden on the servient estates." 329 N.W.2d at 545. *See also Barney*, 490 N.W.2d at 732–33 (similar holding).

A different outcome was reached by the Supreme Court of Washington in *Lawson, supra.* That court held that a right-of-way conveyed to a railroad reverted to the fee owners when it was conveyed to the local government for use as a recreational trail. The *Lawson* court's decision, however, turned on its acceptance of the deeds at issue as being expressly limited to "railroad purposes only." 730 P.2d at 1312. That court stated: "[W]e hold that a change in use from 'rails to trails' constitutes abandonment of an easement *which was granted for railroad purposes only." Lawson*, 730 P.2d at 1313 (emphasis added). While appellants allege that the right-of-way in the instant case was for railroad purposes only, as discussed above, the language of the deed simply provides no support for its contention. The deed in this case is similar to the deed construed in *State by Wash. Wildlife Preservation, supra*, and therefore that case provides the more persuasive authority.

In sum, the deed in this case conveyed the general use of a right-of-way. The grantee railroad is obligated under statutory and common law to operate and use its assets for the furtherance of the general public welfare. This obligation runs to its rail corridors, which, in effect, are public highways that must conform in their use to new modes of transportation so long as they are reasonable and are no more burdensome to the servient estate. Finally, the conversion of a railway used for freight to a footpath is consistent and compatible with the prior railway use. As the Minnesota Supreme Court stated:

"The right-of-way is still being used as a right-of-way for transportation even though abandoned as a railroad right-of-way. Recreational trail use of the land is compatible and consistent with its prior use as a rail line, and imposes no greater burden on the servient estates. The use is a public use, which is consistent with the purpose for which the easement was originally acquired. State and federal stat-

utes encouraging the conversion of railroad rights-of-way to recreation trails also support our holding."

*State by Wash. Wildlife Preservation,* 329 N.W.2d at 547.

## IV. ABANDONMENT

The final issue we address is the certified question regarding whether the railroad's easement has been abandoned. We initially observe that appellants' arguments on abandonment appear to be predicated on their contention that the scope of the easement was for railroad purposes. The Country Club contends, for example, that various facts show "that the Railroad was not going to be using this property *for railroad purposes again.*" (Emphasis added). Along the same lines, the land company contends that the railroad "had no intent to continue *railroad use.*" (Emphasis added). These arguments of the appellants in part reflect the overlapping nature of the questions of scope and abandonment. As we stated in *Peck v. Baltimore County,* 286 Md. 368, 410 A.2d 7 (1979):

> "The use to which the County proposes to put the land in question is relevant to whether it has an intention to abandon. If it were to be found that the contemplated use were within the scope of the easement this could be evidence of a lack of intention to abandon. If the contemplated use were not within the scope of the easement, then unless it be found that some other permitted use is being made, it is *possible* that an intention to abandon might be found, although if the contemplated use is found not to be within the scope of the easement this would not necessarily establish an intention to abandon." (Emphasis in original).

286 Md. at 377–78, 410 A.2d at 11.

As *Peck* suggests, in the instant case if the scope of the easement were limited to railroad purposes, then an intent to abandon railroad use could indicate an intent to abandon the easement. However, the converse is also true. If the easement is not limited in its scope to railroad purposes, then, in order for there to be an abandonment, the party alleging abandonment must show more than an intent to abandon

railroad service. In *Ma. & Pa. RR. Co.*, we addressed whether an easement held by a railroad had been abandoned and explained:

> "The general rule is that the right and title to a *mere* easement in land acquired by a *quasi*-public corporation, either by purchase, condemnation or prescription, for a public purpose is dependent upon the *continued use of the property for that purpose*, and when such .public use is abandoned the right to hold the land ceases, and the property reverts to its original owner or his successors in title." (Emphasis in original and added).

224 Md. at 39, 166 A.2d at 250.

Since we have held that the scope of the easement permits use of the right-of-way as a trail, the facts indicating that the railroad did not intend to resume *rail service* prove unhelpful to appellants' abandonment arguments. We held in Part III that the trail use, in the words of *Ma. & Pa. RR. Co.*, is a "continued use of the property for th[e] purpose" for which it was conveyed, *i.e.*, transit uses. *Id.* To the extent that appellants' abandonment arguments rest on their contention that the scope of the easement is limited to railroad purposes, they fail to meet their burden of proving abandonment.

Nevertheless, we will assume, *arguendo*, that appellants' allegations that the right-of-way has been abandoned does not hinge upon the issue of the scope of the easement. We therefore begin with an examination of Maryland law on easement abandonment and a description of the federal regulatory scheme, which is crucial to an understanding of the various actions the railroad took in the years immediately preceding its conveyance to the County.

A. State Law "Abandonment" Versus
Regulatory "Abandonment"

1.

In *Vogler v. Geiss*, 51 Md. 407 (1879), our predecessors set forth the standard by which to measure whether an easement has been abandoned. In that case, we said:

"It is now very well settled, by authorities of the highest character, that a party entitled to a right of way or other mere easement in the land of another may abandon and extinguish such right by acts *in pais*, and without deed or other writing. The act or acts relied on, however, to effect such result, must be of a decisive character; and while a mere declaration of an intention to abandon will not alone be sufficient, the question, whether the act of the party entitled to the easement amounts to an abandonment or not, depends upon the intention with which it was done, and that is a subject for the consideration of the jury. A cesser of the use, coupled with any act clearly indicative of an intention to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time." (Emphasis in original and citations omitted).

*Vogler*, 51 Md. at 410. *See also D.C. Transit v. State Rds. Comm'n*, 265 Md. 622, 627, 290 A.2d 807, 810 (1972)(*D.C. Transit II*)("The rule of *Vogler* has been approved and followed."); *Brooke, supra; 1.44 Acres of Land*, 304 F.Supp. at 1069 (quoting *Vogler*).

 Since there is rarely direct evidence of an intent to abandon, the question of abandonment hinges upon the manifestations (or lack thereof) of an intent to abandon, and "the issue in most cases is reduced to the question of what factors or circumstances are sufficient to justify an inference that there existed an intent to abandon." *What constitutes abandonment of a railroad right of way*, 95 A.L.R.2d 468, § 2, at 470 (1964). No single factor is usually sufficient to establish the inference of abandonment. *Id.* Rather, *Vogler* and its progeny make clear that non-use alone is insufficient to show an intent to abandon; there must be an act or a combination of acts that unequivocally demonstrate an intention to abandon. *See Shuggars v. Brake*, 248 Md. 38, 46, 234 A.2d 752, 758 (1967)("An easement may not be lost unless there is some act clearly and unequivocally indicating an intention to abandon it, and mere non-user is not enough."); *Cooper v. Sanford Land Co.*, 224 Md. 263, 266, 167 A.2d 602, 604 (1961)("[T]wo ele-

ments are necessary to show an abandonment, namely, an intention to abandon, and an overt act, or an omission to act, by which such intention is carried into effect."); *Ma. & Pa. RR. Co.*, 224 Md. at 40, 166 A.2d at 250 ("[T]he law is well settled that the intent to abandon may be shown by the acts of a party indicating such an intention."); *Klein v. Dove*, 205 Md. 285, 295, 107 A.2d 82, 87 (1954), *citing Lichtenberg v. Sachs*, 200 Md. 145, 156, 88 A.2d 450, 455 ("Mere non-user of a right of way is not necessarily an abandonment of it."); *Knotts v. Summit Park Co.*, 146 Md. 234, 240, 126 A. 280, 282 (1924)("[W]here a right of way is acquired by grant, as in this case, it cannot be lost by mere non-user, for however long a time, unless such non-user is accompanied by some act indicating clearly and unequivocally an intention of the grantee to abandon it."); *Green v. Pennsylvania R. Co.*, 141 Md. 128, 132, 118 A. 127, 128 (1922)("Intention is an essential element of abandonment."); *Canton Co. v. Balto. & Ohio R. Co.*, 99 Md. 202, 218, 57 A. 637, 638–39 (1904)(observing that nonuse "will not *per se* operate as abandonment, unless there is some decided and unequivocal act of the owner inconsistent with the continued existence of the easement"); *Glenn v. Davis*, 35 Md. 208, 217 (1872)("Unquestionably, the law is well settled that an easement may be abandoned by the acts of a party indicating such an intention.").[8]

---

**8.** An easement obtained through prescriptive use, however, may be abandoned through non-use alone, if the non-use lasts the prescriptive period. *See Browne v. M.E. Church*, 37 Md. 108, 119 (1872)("[Since] the right ... had been acquired ... by *adverse user*, for twenty years[,] its *non-user* for a like space of time, would extinguish any right they acquired ... because such *cesser* to use the road, would afford legitimate presumption of a release of the right." (Emphasis in original.)); *Wright v. Freeman*, 5 H. & J. 467, 476–77 (1823)("adversary user of a right of a way over the lands of another for twenty years, shall be a sufficient foundation to presume that the right originated in grant, it must follow, upon every principle, that the non-user of the right may be extinguished"); *Cherry v. Stein*, 11 Md. 1, 21–22 (1858)(discussing holding in *Wright v. Freeman, supra*, that "the adversary user of a right of way over the lands of another for twenty years, would be a sufficient foundation to presume, that the right originated in a grant; and consequently, for the purpose of quieting possession, it must follow that

■■ Finally, while the determination turns on the acts of the holder of the easement indicating an intention to abandon, it is well-settled that "the burden of proving abandonment rests on the one who asserts or relies on it." *Ma. & Pa. RR. Co.*, 224 Md. at 40, 166 A.2d at 250. *See also D.C. Transit I*, 259 Md. at 691, 270 A.2d at 801; *Ayres v. Hellen*, 235 Md. 258, 261, 201 A.2d 509, 510 (1964); *Klein*, 205 Md. at 295, 107 A.2d at 87.

In several of our previous cases, we have upheld findings that an easement has been abandoned, concluding that the necessary unequivocal acts were present. For example, in *Stewart v. May*, 119 Md. 10, 85 A. 957 (1912), we affirmed a finding that an easement had been abandoned when no use had been made of it for "at least twelve years" and, among other factors, the holder of the easement "had built over the [easement] in such way as to make it impossible for them to enjoy [it]." 119 Md. at 19, 85 A. at 960. In *Cityco Realty Co. v. Phila., B. & W.R. Co.*, 158 Md. 221, 148 A. 441 (1930), we concluded that an easement had been abandoned in an action brought to compel the railroad to construct and maintain a farm crossing that had not been used for more than 20 years before the acquisition of land by the plaintiff and where the land had been conveyed without reservation. And in *Hagerstown & F. Rwy. Co. v. Grove*, 141 Md. 143, 118 A. 167 (1922), we upheld a finding of abandonment after a railroad had removed its tracks from the right-of-way four years after it was constructed and after it had begun using another route.

■■ In deciding the certified question, we therefore must decide whether there has been a sufficiently "decided and unequivocal act of the owner inconsistent with the continued existence of the easement." *Canton*, 99 Md. at 218, 57 A. at 639. Before examining the facts to see if any one of them or taken together they are sufficiently decisive to support a

twenty years of non-user of the right would extinguish it, by creating a presumption of its release.").

finding of abandonment, it is necessary to review the federal regulatory scheme under which the railroad operates.

## 2.

Interstate rail carriers have long been subject to comprehensive federal regulation as common carriers. *See Chicago, R.I. & P.R. Co. v. Hardwick Farmers Elev. Co.*, 226 U.S. 426, 433–35, 33 S.Ct. 174, 174–75, 57 L.Ed. 284, 286–87 (1913). Under the Interstate Commerce Act, the ICC [9] oversees the common carrier obligations of freight railroads operating in interstate commerce. *See* 49 U.S.C. § 11101(a)(requiring railroads subject to ICC jurisdiction to "provide . . . service on reasonable request"). Furthermore, railroads subject to ICC jurisdiction may construct or acquire new railroad lines only if the ICC finds that public convenience and necessity require or permit their acquisition or construction. 49 U.S.C. § 10901. Federal law also controls a railroad's abandonment of its railroad lines or the discontinuation of rail service over any part of its lines. 49 U.S.C. § 10903 (requiring a railroad to obtain a certificate of abandonment or discontinuance prior to taking either action). Permission for abandonment or discontinuation also depends upon an ICC finding of "public convenience and necessity." 49 U.S.C. § 10903(a)(2). The ICC must deny the abandonment application if it "fails to find public convenience and necessity." 49 U.S.C. § 10903(b)(1)(B). In making a finding of public convenience and necessity, the ICC must consider "whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development." 49 U.S.C. § 10903(a)(2). The Supreme Court has concluded that the "public convenience and necessity" standard involves a balancing test:

---

9. On January 1, 1996, the ICC ceased to exist and its duties were transferred to the Surface Transportation Board (STB), in the Department of Transportation. Act of Dec. 29, 1995, Pub.L. No. 104–88, 1995 U.S.C.C.A.N. (109 Stat.) 803. Since the "ICC Termination Act of 1995" had not taken effect at the times relevant to this decision, we shall refer only to the ICC, although the ICC's powers now reside with the STB.

"The benefit to [the railroad] of the abandonment [should be balanced] against the inconvenience and loss to [the public]. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce.... Whatever the precise nature of these conflicting needs, the determination is made upon a balancing of the respective interests.... In that balancing, the fact of demonstrated prejudice to interstate commerce and the absence of earnings adequate to afford reasonable compensation are, of course, relevant and may often be controlling. But the [A]ct does not make issuance of the [abandonment] certificate dependent upon a specific finding to that effect."

*Colorado v. United States,* 271 U.S. 153, 168–69, 46 S.Ct. 452, 456, 70 L.Ed. 878, 885–86 (1926). When the ICC issues an order finding that public convenience and necessity allow a carrier to abandon a line, that order is permissive, not compulsory, and the railroad may choose not to exercise its permission to abandon. *See Consolidated Rail Corp. v. Surface Transp. Bd.,* 93 F.3d 793, 797–99 (D.C.Cir.1996). Moreover, until abandonment has been consummated, the ICC "may at any time on its own initiative" reconsider its grant of permission to abandon if it finds "material error, new evidence, or substantially changed circumstances." 49 U.S.C. § 10327(g)(1).

Congress enacted the Rails–to–Trails Act in 1983 against this background of federal regulation over the abandonment of railroad rights-of-way. 16 U.S.C. § 1247(d). The Rails–to–Trails Act amended the National Trails System Act by adding to it subsection (d), which in essence provides a third option for railroads in lieu of an application to either abandon the line or discontinue service. That section provides in pertinent part:

"[I]n furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service ... in the case of interim use of any established railroad rights-of-way ... such interim use shall not be treated, for purposes of any law or rule of law, as an

abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Commission shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use." [10]

The Act was the "culmination of congressional efforts to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails." *Preseault,* 494 U.S. at 5, 110 S.Ct. at 918, 108 L.Ed.2d at 9. "Congress apparently believed that every line is a potentially valuable national asset that merits preservation even if no future rail use for it is currently foreseeable." *Preseault,* 494 U.S. at 19, 110 S.Ct. at 926, 108 L.Ed.2d at 18–19. The statute provides a means by which railroads can escape from the economic burden of maintaining unprofitable railroad lines without loss of the right-of-way, while using those rights-of-way for the public benefit in the interim. Potential interim trail use is considered prior to abandonment of rail lines, and if an agreement for interim trail use is consummated, abandonment is foregone.

The rails-to-trails provisions are triggered only when the railroad files an application with the ICC proposing to abandon the line. *See* 49 C.F.R. § 1152.29 (requiring the entity interested in acquiring the right-of-way to participate when

---

**10.** The Fifth Amendment takings claim arises out of the 16 U.S.C. § 1247(d) language declaring that "interim use of any established railroad rights-of-way ... shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." In *Preseault v. ICC,* 494 U.S. 1, 16–17, 110 S.Ct. 914, 924, 108 L.Ed.2d 1, 17 (1990), the Supreme Court held that, if the interim trail use agreement results in a taking of a state property interest, the owner of the taken property has a claim under the Tucker Act, 28 U.S.C. § 1491(a)(1)(1994, Supp. II 1996). It is the Tucker Act claim that the appellants are pursuing in this case.

the rail line is "proposed to be abandoned"); *Birt v. Surface Transp. Bd.*, 90 F.3d 580, 581–82 (D.C.Cir.1996)(observing that § 1247(d) may come into play when "a railroad seek[s] to abandon a line"). If the ICC finds the Act applicable, it will delay the effective date of the abandonment order pending negotiations between the proposed trail sponsor and the railroad. 49 C.F.R. § 1152.29(c). The ICC issues a Certificate of Interim Trail Use or Abandonment (CITU)[11] allowing the railroad to negotiate an agreement with the public or private organization willing to assume responsibility for the right-of-way. The certificate may be issued only when the circumstances are otherwise such that "the public convenience and necessity ... permit abandonment." 49 C.F.R. § 1152.29(b)(1)(ii)(B).

If an agreement on trail use is reached with a state or local government or private group, § 1247(d) treats the interim trail use as a discontinuance of service, in which ICC jurisdiction is preserved over the right-of-way, rather than an abandonment that would terminate ICC jurisdiction and cause any right-of-way held as an easement to revert to the owner of the underlying estate in fee simple. According to federal regulations, the issuance of the CITU "[p]ermit[s] the railroad to discontinue service, cancel tariffs, and salvage track and material consistent with interim trail use and rail banking." 49 C.F.R. § 1152.29(c)(1). Furthermore, "[t]he CITU will indicate that interim trail use is subject to future restoration of rail service." 49 C.F.R. § 1152.29(c)(2). In several cases, the ICC has ordered that service be restored over rail lines that had previously been converted to trails under 16 U.S.C. § 1247(d). *See Norfolk and Western Railway Company—Abandonment between St. Marys and Minster in Auglaize County, OH*, 9 I.C.C.2d 1015, 1017 (1993); *Missouri Pacific Railroad Company—Abandonment Exemption—in St. Louis*

**11.** More accurately, the ICC will issue either a Notice of Interim Trail Use (NITU) or a Certificate of Interim Trail Use or Abandonment (CITU), depending on the nature of the abandonment proceedings; the difference is not relevant for our purposes since their effect is the same. In the instant case, the ICC issued a CITU.

*County, MO,* Dkt. No. AB–3 (Sub–No. 98X)(Surface Trans. Bd., April 18, 1997); *Iowa Power, Inc.—Construction Exemption—Council Bluffs, IA,* 8 I.C.C.2d 858 (1990). Thus, during the interim the rail corridor is held in a national "rail bank," over which federal regulators retain jurisdiction for the possibility of future rail use.

In addition to the need to comply with federal laws and regulations governing the cessation of railroad service and the potential abandonment of railroad property, Maryland law governs a railroad's disposition of railroad corridor property that has been abandoned pursuant to the ICC process. Md. Code (1977, 1993 Repl.Vol.), Transportation Art., § 7–901. Section 7–901 covers "any railroad property owned or maintained by a railroad company ... [that] is or was subject to the Interstate Commerce Commission's abandonment process." Section 7–901(c) requires a railroad to notify the state of its intent to dispose of a corridor. That provision states in pertinent part:

"(c) *Notice of sale or disposition—Required.*—If a railroad company intends to sell or otherwise dispose of any railroad corridor property that is located in this State *and for which the company has received permission from the Interstate Commerce Commission or other governmental agency with jurisdiction in the matter to abandon transportation services,* the company shall notify the Secretary and the Administration of its intent to sell or otherwise dispose of the property." (Emphasis in original and added).

The notification provisions of § 7–901 are intended to facilitate the state's acquisition of abandoned railroad property. *See* § 7–901(b)(authorizing acquisition of railroad corridor property). *See also* Md.Code (1974, 1997 Repl.Vol.), Natural Resources Art., § 5–1010 (declaring Maryland policy of preserving railroad corridors for trail use and authorizing the Department of Natural Resources to acquire rail corridors).

■ While we have never had to address whether notification under § 7–901 is required when federal regulators certify a rails-to-trails agreement (as opposed to authorizing abandon-

ment of the line), it would appear that the section is inapplicable when a CITU is issued since a CITU is issued in lieu of approval of abandonment. This interpretation of state law is consistent with the ICC's "exclusive and plenary" jurisdiction over railroads up until the time when the ICC approves of abandonment. *See Chicago & N.W. Tr. Co. v. Kalo Brick & Tile,* 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258, 267 (1981). *See also Preseault,* 494 U.S. at 8, 110 S.Ct. at 920, 108 L.Ed.2d at 11. The notification requirement is effective only after "the company has received permission ... to abandon transportation services." Md.Code (1977, 1993 Repl.Vol.), Transportation Art., § 7–901(c). Presumably, this is because when the ICC approves an abandonment petition, "as a general proposition ICC jurisdiction terminates." *Preseault,* 494 U.S. at 6 n. 3, 110 S.Ct. at 918 n. 3, 108 L.Ed.2d at 10 n. 3. *See also* 54 Fed.Reg. 8011–12 (1989). In other words, the Maryland statute comes into play only when a railroad disposes of railroad corridor property for which federal regulatory jurisdiction has ceased; since ICC regulation continues after a CITU is issued, § 7–901 would not be applicable under a rails-to-trails agreement pursuant to 16 U.S.C. § 1247(d).

### B. The Railroad's Pursuit of Regulatory Abandonment

Turning to the instant case, we first note that the facts alleged to support appellants' contentions that the easement conveyed by the 1911 deed has been abandoned relate largely to actions taken by the railroad pursuant to the federal regulatory scheme. The appellants emphasize that the railroad's intent to abandon the Georgetown Branch is demonstrated by the following: the 90% decline in traffic over the years 1969 to 1985; the posting of notices in 1983 declaring that an abandonment application would be filed with the ICC within three years; the discontinuation of service in 1985 due to the need for major repairs on the trestle over Rock Creek after a storm; the B & O Executive Committee's vote to "abandon or discontinue service" over the Georgetown Branch

in 1985; and the filing of the application for abandonment and discontinuance of service on April 9, 1986.

> The land company concludes on the basis of these facts that "[t]he undisputed evidence ... shows that [the railroad] publicly stated its intention to abandon the Georgetown Branch in 1983, that an internal decision to proceed with abandonment was made in 1984, that the use of the right of way was, in fact, terminated on May 10, 1985 and that [the railroad's] directors formally adopted a resolution of abandonment on July 22, 1985, more than three years before ... agree[ing] to give Montgomery County a quitclaim deed."

The land company concludes that abandonment occurred in 1985 when service was discontinued because of the need for major bridge repairs. The Country Club argues that the easement "for railroad purposes" was abandoned by April 1986 when the railroad filed its ICC application and that "abandonment certainly did not occur any later than the February 1988 order of the ICC approving the abandonment." Appellants apparently concede that if the railroad had not been abandoned for purposes of state law by February 1988 (when the ICC authorized abandonment but stayed the effect of its authorization), then the right-of-way was not abandoned under Maryland law when the railroad conveyed the quitclaim deed to Montgomery County in December 1998.

The appellants' arguments oversimplify the nature of the railroads' actions. Outside of the decline in use of the line and the decision to forego repairs on the bridge over Rock Creek, which we discuss further below, the acts alleged to support a finding of abandonment of the state law property interest relate primarily to the railroad's plans to undertake an abandonment proceeding before the ICC. In regard to these facts, the issue seems to be largely one of nomenclature, i.e., whether the term "abandonment" in the context of an ICC proceeding can be used synonymously with the state law concept of "abandonment" of an easement. We believe that appellants unnecessarily confuse the state law question by relying on actions taken by the railroads to comply with regulatory

"abandonment" under federal law. As we explain next, the railroad's actions in pursuing regulatory "abandonment" before the ICC are consistent with an intent to retain its state law property interests; in fact, the railroad's actions are mandated under federal law in order for the railroad to take any action to reduce or eliminate, even temporarily, its common carrier obligations. As a result, the facts alleged by appellants to evidence the railroad's intent to abandon the right-of-way prove unhelpful in determining the question of whether the right-of-way was abandoned.

## 1.

Appellants acknowledge that the state law question of abandonment is distinct from ICC action on abandonment. The land company argues, however, that actions taken pursuant to the federal regulatory regime establish the necessary intent to abandon under state law. For example, the notices posted in 1983 that the line would be the subject of an abandonment proceeding, the internal decisions of the committees of the railroad companies to pursue abandonment in 1984 and 1985, and the filing of the application for abandonment in 1986 are alleged to constitute evidence of abandonment.

Each of these actions, however, is a prerequisite for a railroad wishing to sell its interests in a right-of-way or to participate in a rails-to-trails agreement pursuant to 16 U.S.C. § 1247(d). Federal regulations require a railroad to post a notice on the line informing readers that the line is anticipated to be the subject of an ICC regulatory proceeding. *See* 49 C.F.R. § 1152.20(a)(3). The corporate resolutions are necessary internal decision-making steps for pursuing regulatory abandonment, and a railroad obviously cannot obtain approval for discontinuance of service or abandonment without filing an application with federal regulators.

Even if we were to conclude that the word "abandon" in the regulatory context could be synonymous with state law abandonment of an easement, the railroad's application to the ICC made clear that the "[a]pplicants seek to abandon and discontinue *service* " over the Georgetown Branch, not their interest

in the land. (Emphasis added). The application repeatedly refers to the "proposed abandonment," and it noted that "various public bodies may be interested in acquiring the subject properties for public purposes or uses." As the federal appeals court for the D.C. Circuit recently observed, "[t]he word 'abandon' has a precise meaning in this regulatory scheme." *NARPO v. STB,* 158 F.3d 135, 137 n. 1 (D.C.Cir. 1998). *See also Cristofani v. Board of Education,* 98 Md.App. 90, 92 n. 1, 632 A.2d 447, 448 n. 1 (1993)(observing that "abandonment" is a concept in other areas of law beyond the easement context); *Vieux v. East Bay Regional Park Dist.,* 906 F.2d 1330, 1339 (9th Cir.)(noting the permissive nature of ICC abandonment approval, which "is only a determination that . . . cessation of service would not hinder ICC's purposes. It is not a determination that the railroad has abandoned its lines"), *cert. denied,* 498 U.S. 967, 111 S.Ct. 430, 112 L.Ed.2d 414 (1990).

■ The railroad's statements and actions are entirely consistent with an intention to sell the right-of-way and to pursue a rails-to-trails agreement pursuant to 16 U.S.C. § 1247(d).[12] An intention to sell the right-of-way is inconsistent with an intent to abandon the property interest. *Vieux,* 906 F.2d at 1341. Moreover, regulatory abandonment was never even consummated since a trail use agreement was reached. Indeed, the corridor cannot have been abandoned

---

12. Furthermore, the application for regulatory abandonment should be read in the context of the statutory language requiring a railroad intending a sale pursuant to a rails-to-trails agreement to carry the burden of showing that abandonment is consistent with the public convenience and necessity standard. 49 U.S.C. § 10904(d)(1)("[T]he burden is on the person applying for the certificate [of abandonment or discontinuance] to prove that the present or future public convenience and necessity require or permit the abandonment or discontinuance.") Thus, in an apparent effort to meet the burden, the railroad explained that the line "could not be operated profitably by B & O even in the event that rehabilitation were performed." As noted in the main text, to read into the railroad's effort to meet its burden under federal regulatory law an intent to abandon its state law property interest in the right-of-way would create an irreconcilable dilemma for any railroad wishing to pursue an agreement under 16 U.S.C. § 1247(d).

under federal law because the trail use is only interim, and federal regulators may require the restoration of rail service. 49 C.F.R. § 1152.29(c)(2). *See* Part IV.A.2.

Of course, it is not an impossibility for a railroad to abandon its state law property interest when a trail-use agreement is pursued. But the decisive act required to carry the abandonment proponent's burden of proof cannot be supplied by acts entirely consistent with the federal regulatory scheme, which precludes such abandonment. Furthermore, if abandonment of the state-law property interest occurs when a trail use agreement is being pursued in compliance with federal law, that abandonment would occur without the federal regulatory approval which, as discussed next, could result in civil and criminal liability.

### 2.

Appellants' contention that the right-of-way was abandoned prior to the consummation of the agreement with Montgomery County would require us to conclude that the railroad intended to disobey rather than comply with various provisions of federal and state law. In other words, if it had the intent to abandon its state law property interests prior to ICC action, the railroad would have to also have intended to violate several provisions of federal law, subjecting itself to various criminal and civil sanctions. *See* 49 U.S.C. §§ 11901, 11906.[13]

---

**13.** 49 U S.C. § 11901 provides in pertinent part:

"(a) Except as otherwise provided in this section, a common carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... an officer or agent of that carrier or a receiver, trustee, lessee, or agent of one of them, knowingly violating an order of the Commission under this subtitle is liable to the United States Government for a civil penalty of $5,000 for each violation. Liability under this subsection is incurred for each distinct violation. A separate violation occurs for each day the violation continues."

49 U.S.C. § 11914 provides in pertinent part:

"(a) When another criminal penalty is not provided under this chapter, a common carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title, and when that carrier is a corporation, a director or officer of the corporation, or a receiver, trustee, lessee, or

As one court explained, "because of the importance of uninterrupted rail transportation service in the nation's economy, Congress has expressed a clear intent, even to the point of criminal sanctions, that abandonments without prior ICC approval are not tolerated." *I.C.C. v. Baltimore and Annapolis Railroad Company*, 398 F.Supp. 454, 464 (D.Md.1975), *aff'd* 537 F.2d 77 (4th Cir.), *cert. denied sub nom Alco Gravure, Inc. v. Baltimore and Annapolis Railroad Company*, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976). *See also Kalo Brick & Tile*, 450 U.S. at 319, 101 S.Ct. at 1131, 67 L.Ed.2d at 266 (recognizing authority of the ICC "to pass on the reasonableness of a carrier's temporary suspension of its service and, if necessary, to order it resumed"); *Ethan Allen, Inc. v. Maine Cent. R. Co.*, 431 F.Supp. 740, 744–45 (D.Vt.1977)(holding that a railroad could be liable to a shipper for unauthorized abandonment).

The *per se* ban on abandonment without regulatory approval facilitates other aspects of the federal regulatory regime. Under 49 U.S.C. § 10905, a railroad may not abandon its line immediately on the date which the ICC determines that public convenience and necessity permit abandonment. Rather, abandonment is delayed by at least ten days after notice of the abandonment order is published in the *Federal Register* to allow any "financially responsible person" to "offer to pay the carrier a subsidy or offer to purchase the line." 49 U.S.C. § 10905(c)–(d).[14] If a financially responsible person makes an

---

person acting for or employed by the corporation that, alone or with another person, willfully violates this subtitle or an order prescribed under this subtitle, shall be fined not more than $5,000. However, if the violation is for discrimination in rates charged for transportation, the person may be imprisoned for not more than 2 years in addition to being fined under this subsection. A separate violation occurs each day a violation of section 11321(a) or 11342 of this title continues."

**14.** 49 U.S.C. § 10905 provides in pertinent part:

"(c) When the Commission finds under section 10903 of this title that the public convenience and necessity require or permit abandonment or discontinuance of a particular railroad line, it shall, concurrently with service of the decision upon the parties, publish the finding in

offer, issuance of the ICC certificate is further delayed 30 days, allowing the railroad and the offeror to negotiate the terms of the purchase or subsidy. 49 U.S.C. § 10905(e). If they are unable to agree on terms, either the railroad or offeror may ask the Commission to establish the terms and conditions of the sale or subsidy. 49 U.S.C. § 10905(e)–(f). *See Hayfield N.R. Co. v. Chicago & N.W. Tr. Co.*, 467 U.S. 622, 629–30, 104 S.Ct. 2610, 2615–16, 81 L.Ed.2d 527, 534–35 (1984).

In the instant case, after the ICC authorized the railroad to abandon the Georgetown Branch, Laurel Sand & Gravel

---

the Federal Register. Within 10 days following the publication, any person may offer to pay the carrier a subsidy or offer to purchase the line. Such offer shall be filed concurrently with the Commission.... (d) If, within 15 days after the publication required in subsection (c) of this section, the Commission finds that—

(1) a financially responsible person (including a government authority) has offered financial assistance to enable the rail transportation to be continued over that part of the railroad line to be abandoned or over which all rail transportation is to be discontinued; and

(2) it is likely that that assistance would be equal to—

(A) the difference between the revenues attributable to that part of the railroad line and the avoidable cost of providing rail freight transportation on the line, plus a reasonable return on the value of the line; or

(B) the acquisition cost of that part of the railroad line;

the Commission shall postpone the issuance of a certificate authorizing abandonment or discontinuance in accordance with subsections (e) and (f) of this section.

(e) If the carrier and a person offering financial assistance enter into an agreement which will provide continued rail service, the Commission shall postpone the issuance of the certificate for so long as the agreement, or an extension or modification of the agreement, is in effect. If the carrier and a person offering to purchase a line enter into an agreement which will provide continued rail service, the Commission shall approve the transaction and dismiss the application for abandonment or discontinuance. If the carrier and a financially responsible person (including a government authority) fail to agree on the amount or terms of the subsidy or purchase, either party may, within 30 days after the offer is made, request that the Commission establish the conditions and amount of compensation. If no agreement is reached within 30 days after the offer is made and neither party requests that the Commission establish the conditions and amount of compensation during that same period, the Commission shall immediately issue a certificate authorizing the abandonment or discontinuance."

(LSG) filed an offer of financial assistance under 49 U.S.C. § 10905. The Commission found LSG to be "financially responsible" and directed the railroad to negotiate a subsidy or sale of the line to LSG. These negotiations took precedence over the proposed rails-to-trails conversion being discussed at that time with the County. *See Rail Abandonments—Use of Rights-of-Way as Trails,* 2 I.C.C.2d 591, 608 (1986). The negotiations lasted more than six months but ultimately proved unsuccessful; LSG subsequently withdrew its offer of financial assistance. Under the theory proposed by appellants, however, the negotiations between the railroad and LSG would have been essentially meaningless, since prior to the start of negotiations with LSG the railroad would have had already abandoned its right-of-way; under appellants' theory, had an agreement been reached, LSG would have either been a trespasser over the abandoned right-of-way or it would have had to reacquire the right-of-way from the land company.

In addition to the requirement of entertaining offers of financial assistance, the railroad was subject to the ICC's broad authority to place conditions on regulatory abandonment. *See* 49 U.S.C. § 10903(b)(1)(A)(ii)(granting the ICC the power to approve abandonment *"with modifications . . . [and] conditions* that the Commission finds are required by public convenience and necessity")(emphasis added). Under 49 U.S.C. § 10906, the Commission must make a determination of "whether the rail properties that are involved in the proposed abandonment or discontinuance are suitable for use for public purposes, including highways, other forms of mass transportation, conservation, energy production or transmission, or recreation." Should the Commission find the rail properties suitable for public purposes, "the properties may be sold, leased, exchanged, or otherwise disposed of *only under conditions provided in the order of the Commission." Id.* (emphasis added). Again, if the railroad had abandoned its property interests before the ICC acted pursuant to its abandonment application, it would have been impossible for the railroad to comply with any conditions imposed on the abandonment without being deemed a trespasser on the right-of-

way. Moreover, the conclusion that the easement had been abandoned prior to the conveyance of the quitclaim deed—thereby leaving the railroad with no interest in the right-of-way—would appear to contravene the spirit of the Maryland law authorizing acquisition of the right-of-way. *See* Part IV.A.2, *supra.*

■ We do not lightly presume, as appellants do, that a person, or in this case a railroad company, acted contrary to explicit legal requirements. "Where an individual proposes to engage in what is otherwise a lawful venture, the presumption is that he will conduct his activities in a proper manner." *Leatherbury v. Gaylord Fuel Corp.,* 276 Md. 367, 377, 347 A.2d 826, 832 (1975). This is particularly the case where, as here, criminal sanctions may be involved. No evidence in this case would support a finding that the railroad violated or intended to violate the law, and we could not uphold a finding that it took action that would be tantamount to a federal crime and that would expose it to civil liability without substantial evidence that it intended to do so, evidence which is not present here. *See also Md. Securities v. U.S. Securities,* 122 Md.App. 574, 588, 716 A.2d 290, 297 (1998)(stating presumption that administrative officers "act[ ] regularly and in a lawful manner"); *Valentine v. On Target,* 112 Md.App. 679, 692, 686 A.2d 636, 642 (1996)(purchasers of firearms presumed to have made purchase for legitimate purposes), *aff'd,* 353 Md. 544, 727 A.2d 947 (1999). The stipulated facts all indicate that the railroad was making every effort to comply with the law. Yet, a finding that the railroad had abandoned its state law property interest in the right-of-way would be tantamount to a finding that the railroad intended to violate the law, thereby exposing itself to criminal and civil sanctions. This we decline to do.

### 3.

■ If we were to accept the appellants' efforts to use the railroad's acts taken in pursuit of federal regulatory approval for "abandonment" as the decisive acts necessary to demonstrate an intent to abandon an easement under state law, it

would create an irreconcilable dilemma for railroads wishing to pursue rails-to-trails agreements or otherwise dispose of their property interests in right-of-ways. The railroad could not pursue a rails-to-trails agreement without filing an application for regulatory abandonment at the ICC, but the actions taken to pursue such an application, and the application itself, would constitute evidence of abandonment for state law purposes, thereby causing it to risk undermining the rails-to-trails agreement. This would create a Hobson's choice for the railroad that must apply for regulatory abandonment under federal law as the necessary first step to obtaining a CITU, while that application itself would constitute evidence of an intent to abandon in terms of state law (thereby undermining the CITU effort by making it more costly). Such a holding would completely frustrate state and federal policies intended to promote the preservation of rail corridors and their conversion to trail use. We conclude therefore that the actions of the railroad taken to comply with the federal regulatory regime cannot, as a matter of state law, supply the unequivocal act or acts that evidence the intent to abandon an easement interest in land.

### C. The Insufficiency of Any Other Potential Evidence of Abandonment

We must next determine whether the remaining actions of the railroad alleged to constitute abandonment supply sufficient evidence to support a finding of an intent to abandon the easement. Those acts include the railroad's decisions to forego bridge repairs in 1984 and the subsequent discontinuance of use of the line after a storm caused major damage to the bridge in 1985. Even assuming that the forbearance of repairs combined with the nonuse of the right-of-way constitute more than evidence of mere nonuse, we conclude that they are insufficient to meet appellants' initial burden of proving a clear and unequivocal act that is necessary to support a finding of an intent to abandon.

Our conclusion is dictated by our previous cases concerning abandonment of an easement by a railroad. In *Canton,*

*supra,* for example, we affirmed a finding that a railroad right-of-way had not been abandoned when the circumstances much more strongly supported a finding of abandonment than the instant case. The appellant, the Canton Company, was the owner of land over which a right-of-way had been taken in a condemnation proceeding brought by the B & O in 1885 and for which it was paid $20,000. The railroad took possession of the land and laid track, but it never connected the track with its other tracks, and in 1898 it removed the tracks although they never "ha[d] been employed for any substantial use." *Canton,* 99 Md. at 214, 57 A. at 637. In addition, the railroad used other connections instead of going through the condemned land. One of the alternative routes was achieved through a contract, entered into in 1890 and to last 999 years, which required it to ship over that line "all its traffic of every kind passing through the city of Baltimore." *Canton,* 99 Md. at 220, 57 A. at 640. Primarily on the basis of these facts, *Canton* brought an action in ejectment claiming that the railroad had abandoned the strip of land condemned. We affirmed the circuit court's ruling that the easement had not been abandoned, observing that nonuse of an easement will not *per se* operate as abandonment "unless there is some decided and unequivocal act of the owner inconsistent with the continued existence of the easement, or unless the nonuse has been for a considerable period...." *Canton,* 99 Md. at 218, 57 A. at 639. We rejected the contention that the contract for use of an alternative line, requiring "all ... traffic of every kind" to go over that line, was sufficient evidence of abandonment. *Canton,* 99 Md. at 220–21, 57 A. at 640.

Unlike *Canton,* in the instant case, the evidence is undisputed that the railroad actually used the right-of-way for some 90 years until 1985, when the need for major bridge repairs made continued use unfeasible. It is also undisputed that about the time the railroad began taking steps toward obtaining permission from the ICC for regulatory abandonment, a management committee of the railroad had agreed to pursue negotiations with Montgomery County for transfer of the right-of-way. In *Canton,* the railroad made an affirmative decision to remove

tracks on land condemned for a right-of-way—tracks which had never really been used—and to enter a contract whereby "all" of its traffic would go over another line for 999 years; nevertheless, we held that the facts failed to supply the decisive act necessary to show an intent to abandon. In the instant case, there is much less evidence of an unequivocal and decisive act evidencing an intent to abandon the property interest in the right-of-way. The use of the right-of-way ended altogether only because of the deterioration of a bridge (due to a severe weather storm) while at approximately the same time the railroad undertook action to adhere to federal regulations to end service over the line and to negotiate the sale of its assignable interest in the right-of-way pursuant to the Rails–to–Trails Act. The decision to take up tracks and enter a long-term contract for another route in *Canton* provided stronger evidence of an intent to abandon than the decision to forego repairs in the instant case—particularly when that decision is consistent with the contemplated new transit use of the corridor. If anything, the railroad's actions in this case evidence a clear intent not to abandon but to sell to the County its interest in the right-of-way consistent with the requirements of federal regulation. As one court observed in a similar context, "[c]onveyance of property and abandonment of property are not consistent actions." *Vieux*, 906 F.2d at 1341.

Furthermore, a railroad's participation in a rails-to-trails program implies that it does not intend to fully abandon the line, but rather to retain the right-of-way while permitting interim trail use. *Birt*, 90 F.3d at 587; *KCT Railway Corporation—Abandonment Exemption—In Franklin, Anderson, and Allen Counties, KS*, 7 I.C.C.2d 1035, 1036 (1991)(observing that railroad's interest in negotiating trail agreement is "inconsistent with clear intent to consummate the abandonment and implies that KCT may be interested in preserving the right-of-way for the future restoration of rail service"). The facts of this case closely resemble those in *Birt*. In that case, the landowner, Birt, argued that the railroad had abandoned its property interest in the right-of-way prior to the

consummation of a rails-to-trails agreement, thus depriving the ICC of jurisdiction over the rail corridor. In reviewing a decision of the ICC that abandonment had not occurred, the court explained:

> "The Commission has listed several concrete actions which may indicate an intent to abandon: cessation of operations cancellation of tariffs, salvage of the track and track materials, and relinquishment of control over the right-of-way. *These factors, however, are equally consistent with temporary cessation of operations ('discontinuance'), which permits a rails-to-trails conversion but does not effect a permanent abandonment.* Thus, to determine whether the railroad's conduct is abandonment or mere discontinuance, we must often look to additional behavior which signifies one or the other . . . ." (Citations omitted).

*Birt,* 90 F.3d at 585–86. The court also rejected Birt's contention that abandonment occurred as a result of two letters written by the railroad which explicitly conceded that the right-of-way "was abandoned." *Birt,* 90 F.3d at 586. Fewer facts in the instant case are available for reaching a conclusion that the right-of-way was abandoned than in *Birt.* Appellants have produced no letter from the railroad declaring that the right-of-way has been abandoned.[15]

That the right-of-way could not have been abandoned is further evidenced by the federal requirement that when a right-of-way is converted to trail use under 16 U.S.C. § 1247(d), regulatory abandonment is foregone and the ICC's approval is expressly made "subject to the future restoration of rail service." 49 C.F.R. § 1152.29(c)(2)(requiring the CITU to state that "interim trail use is subject to future restoration of rail service"); *id.* at (c)(3)(stating that if a railroad seeks to reinstitute service over the right-of-way, and federal regulators grant permission to do so, "the CITU will be vacated accordingly." As the ICC has stated,

---

**15.** During the course of litigation, however, appellees produced a letter written by the railroad in 1988 expressly stating that the right-of-way had *not* been abandoned.

"By consenting to the issuance of a CITU/NITU, a carrier agrees to forgo consummating the authorized or exempted abandonment. As a consequence, *its common carrier obligation does not terminate.* Instead, *the abandoning carrier retains a residual common carrier obligation and transfers the right-of-way to the trail user, subject to the stipulation that the rail corridor remain available for the reinstitution of rail service.* A carrier's decision to agree to a CITU/NITU is totally voluntary and, as far as the Commission is concerned, may be withdrawn at any time the abandoning carrier wishes to reinstitute rail operations over the right-of-way." (Emphasis added.))

*Norfolk & Western Railway Company—Abandonment between St. Marys and Minster in Auglaize County, OH,* 9 I.C.C.2d 1015, 1018 (1993).

Thus, upon the consummation of a rails-to-trails agreement, the right-of-way is placed in a national "railbank," and, at a later date, federal regulators may permit removal of the corridor from the railbank in order to reactivate service. That service may be reactivated on the right-of-way supports our conclusion that the right-of-way has not been abandoned, for it would be difficult, if not virtually impossible, to reactivate service on an abandoned line.[16]

Our decision avoids frustrating the federal and state public policies of promoting the conversion of railroad rights-of-way for other transportation and recreational uses. Were we to hold otherwise, it would be hard to imagine a situation in which a railroad pursuing a rails-to-trails agreement would not have abandoned its property interest, since there must be some point at which a railroad comports itself differently in anticipation of a rails-to-trails agreement than if it were to continue to operate the line. Conversely, if we were to hold that the failure to repair the bridge over Rock Creek were

---

**16.** Since the right-of-way was expressly made transferable to "successors and assigns," whether service would be reactivated by the railroad, the County, or a future successor in interest has no bearing on our conclusion.

sufficient to carry appellants' burden of proving an intent to abandon, we would create an incentive for a railroad to make futile expenditures in order to avoid being found to have abandoned its property interest under state law as it complies with the mandates of federal law.

We do not intend to intimate that a railroad may never abandon an easement under Maryland law prior to federal regulatory approval of abandonment; rather, we merely hold that under the circumstances of this case, where the actions supporting the alleged abandonment coincide in time and in function with the railroad's efforts to comply with federal law and where there is no suggestion or reason to conclude that the railroad intended to not comply with federal law, as a matter of Maryland law, the facts are not sufficient to meet the burden of showing that abandonment occurred prior to the railroad's conveyance of the quitclaim deed to the County. While the question of abandonment of an easement is to be decided as a matter of Maryland property law, the question should not be resolved in a vacuum in which the federal regulatory scheme is ignored.[17]

---

**17.** Indeed, the CFC implicitly recognized the illogic of ignoring the comprehensive regulation scheme in determining the state law question of abandonment of an easement. In finding that the easement had been abandoned when the ICC issued its order of February 25, 1988, the court discussed at length an early decision of this court, *Benson v. Public Service Comm.*, 141 Md. 398, 118 A. 852 (1922), relating to state regulatory approval of abandonment of rail service. *Benson* involved a suit by citizens against the Maryland Public Service Commission (PSC) contesting the agency's authorization of abandonment of the railroad line. In that case, we upheld the PSC's abandonment order based on its uneconomical operation, declaring that "the only safe criterion [for evaluating whether to abandon service] ... is ... the measure of which is the ability of the [railroad] from its earnings to meet its operating expenses and fixed charges." *Benson*, 141 Md. at 404, 118 A. at 854. The CFC concluded that the PSC standard is not as rigorous as the ICC's "public convenience" standard and, since the February 1988 ICC order concluded that abandonment was appropriate and conditioned abandonment only for inquiry into a Rails–to–Trails agreement, that the order "provided ... the rough equivalent of the PSC abandonment authorization." *Chevy Chase Land Co. of Montgomery*, 37 Fed.Cl. at 580.

Finally, we note that our conclusion that the evidence is insufficient to show that the railroad intended to abandon the right-of-way is consistent with the obvious economic interests of the railroad. The railroad had a "free and perpetual" interest in the portions of the right-of-way at issue in this case; it would have been irrational for the railroad to abandon the right-of-way without attempting to recover some value from its interest in the land. As the stipulated facts demonstrate, the railroad did in fact pursue a course of action whereby it recovered value through the sale of the corridor to the County. As explained above, that course of action was necessarily lengthy and somewhat arduous because of the scheme of federal regulation under which it was operating. The railroad had to pursue that process, however, in order to derive any economic value out of its right-of-way.

In sum, we hold that when a railroad takes actions pursuant to federal regulation that are wholly consistent with an intent to retain the property interest, in this case in order to pursue an interim trail use agreement, those actions alone cannot supply the decisive and unequivocal act evidencing an intent to abandon. It follows that in the instant case, where the appellants have not pointed to any other actions sufficient

---

We agree with the CFC that the regulatory scheme under which the railroad operated is relevant to whether it intended to abandon the right-of-way, but we disagree with its reading of *Benson*. *Benson* did not involve a question of whether an easement had been abandoned, but rather whether the state agency had properly approved abandonment of *service*. *See* Part IV.B.1, *supra* (distinguishing between regulatory abandonment and the state law property concept of abandonment). We upheld an order of the PSC permitting a railroad to abandon service on a portion of its line based on a statute giving it the power "to approve or disapprove of the abandonment or discontinuance ... by any common carrier, railroad corporation, or street railroad corporation of the exercise of the franchise or right conferred upon it by its charter." *Benson*, 141 Md. at 401, 118 A. at 853. The issue in the case concerned the validity of the PSC's order regarding the ceasing of service; we did not discuss nor did the case involve any property law issues such as easement abandonment. Therefore even if we were to agree with the CFC that the February 1988 order of the ICC was the "rough equivalent of the PSC abandonment authorization," our agreement would have no bearing on the issue here related to abandonment of the railroad's property law interest in the right-of-way.

to carry their burden of proving an act sufficiently evidencing an intent to abandon, the right-of-way was not abandoned prior to the railroad's conveyance of the right-of-way to Montgomery County.

## V. CONCLUSION

The first certified question asks whether the 1911 deed to the railroad from the land company conveyed a fee simple absolute or an easement. We have held that it conveyed an easement. The plain text of the instrument states that a right-of-way was conveyed and there is no indication that anything more than a right of passage was intended, particularly in light of the deed's separate conveyance in fee simple of the land on which a passenger station was to be located. This conclusion is confirmed by the circumstances of the conveyance, including the existing railway and the nominal consideration given by the railroad in light of its contractual obligations.

Second, we addressed whether the use of the right-of-way as a hiker/biker trail is within the scope of the easement. Based on the absence of limitations on use of the right-of-way in the language of the deed, we concluded that the use is within the legally anticipated scope of the 1911 deed, in light of the railroad's status as a highly regulated public service corporation. The deed anticipated a means of transit over the right-of-way, and the trail use is consistent with what was anticipated. Moreover, the use of the right-of-way as a trail poses no unreasonable burden on the servient estate; indeed, the use is less burdensome than freight railroad use.

The third certified question asked us to examine whether the railroad had abandoned its state law property interest in the easement. The resolution of the abandonment question required that we assess the federal regulatory framework covering railroad "abandonment," which is distinct from the property law concept of abandonment of an easement. We concluded that appellants failed to meet their burden of alleging a sufficiently decisive and unequivocal act evidencing an

intent to abandon, particularly given that most of the railroad's actions were taken in order to comply with federal law.

**CERTIFIED QUESTIONS ANSWERED AS HEREIN SET FORTH. COSTS IN THIS COURT TO BE EVENLY DIVIDED.**

CATHELL, Judge, dissenting:

I respectfully dissent from the portion of the majority's opinion holding that the railroad line at issue was not abandoned under Maryland property law.

The Court reaches its conclusion on the abandonment issue by answering a question not certified to us by the federal court—the effect of *federal* law on the purported abandonment. In doing so, the majority seeks to answer the ultimate question before the United States Court of Appeals for the Federal Circuit. Our task was to answer the third certified question based on *Maryland* law: "If the deed conveyed an easement . . ., has that easement, as a matter of law, been abandoned at any time since its conveyance, and if so, when?"

Recognizing this distinction, it is important to note the context of the federal case from which the certified question was presented. Plaintiffs, possible owners of real property interests, initiated an action in federal court claiming that those property interests had been the subject of an unconstitutional "regulatory taking" by operation of the federal statutes involved and were entitled to just compensation. They asserted that but for the effect of the federal statutes, they would be the owners of the interest in the property under the state law of abandonment. The federal statutes at issue are those described by the majority as forbidding, for the first time in Maryland, abandonment in the absence of compliance. The issue being litigated in federal court is whether the effect of the same statutes deprive the owners of all economically feasible uses of their property. The majority holds that the plaintiffs do not own an interest in the property because of the effect of the same federal statutes on the Maryland common law pertaining to abandonment.

The Federal Circuit has asked this Court to interpret the Maryland law on abandonment in the absence of the effect of the federal statutes. The majority tells that court what it already knows, not what it needs to know to resolve whether the statutes' impact is so severe as to cause a regulatory taking. Federal courts are able to assess the impact upon the property at issue resulting from the application of the federal statutes. The majority, in some type of reverse "boot strapping" beyond my logical comprehension, answers the certified question by incorporating the effect of the federal statutes into Maryland property law. Under the majority's reasoning, if a federal regulatory statute abolishes a Maryland property right, the property right never existed. Under that theory, an unconstitutional taking of property never could occur.

The question should be answered, and I believe the federal court wanted it answered, as if the federal statutes did not exist. The majority alters an established doctrine of Maryland property law that has existed for one hundred years or more in an attempt to assist the federal government to avoid its constitutional obligation to compensate property owners if a federal statute so impacts the property as to leave the property owner with no viable economical use.

The majority also holds that the conveyances to the railroad in 1911 were conveyances of easements. The United States Court of Federal Claims found to the contrary, but opined that if the early conveyances had granted easements, those easements had been abandoned under Maryland law. *Chevy Chase Land Co. v. United States*, 37 Fed.Cl. 545, 580 (1997). The majority's position in this case directly conflicts with that earlier ruling in the same case. The Court of Federal Claims was correct on the Maryland law of abandonment.

In the case *sub judice*, all parties agree that railway use of the land ceased and has remained inoperative for an appreciable period of time. As the briefs reflect, uncontested and substantial evidence exists that the railroad did not intend to operate rail service, did not operate rail service for an extensive period of time, and intended to abandon that service.

The facts are clear, at least to me, that on May 10, 1985, rail service ceased completely due to the deterioration of a bridge over Rock Creek Park and the prohibitive costs of repairing it. Thereafter, on July 22, 1985, the railroad passed a resolution abandoning railway service. That resolution was at least an expression of intent to abandon the right-of-way, notwithstanding the federal statutes at issue in the federal case. The Baltimore and Ohio Railroad Company, which had been operating the rail service prior to May 10, 1985, consented to that abandonment or intent to abandon, as the case may be. The railroad then filed appropriate abandonment petitions with the ICC. That agency made a determination that abandonment was appropriate, but held up formal approval for the apparent purpose of permitting Montgomery County (County) and the railroad to take advantage of the federal statutes involved in the federal "takings" claims. The County entered into agreements under the statutes and acquired the right-of-way. The railroad cautiously executed only quit claim deeds to the County.

The true issue to be determined by this Court was what property, if any, did the railroad own? If it owned nothing, it conveyed nothing. If it had abandoned its right-of-way prior to that time, the right-of-way would have reverted to the adjacent fee simple owners under Maryland law as the law existed prior to the majority's opinion in this case.

Turning to the Maryland law of abandonment, this Court said in a case involving a dispute over a right-of-way created as early as 1790, that rights-of-way can be abandoned by nonuse combined with an *intention* to abandon:

> [I]t must follow, upon every principle, that the non-user of the right may be extinguished, by presuming a release of it for the purpose of quieting the possession. And the presumption of a release in this case is strongly fortified by the circumstance, that the parties, to whom the right of way in question was originally granted, and those claiming under them, had used another and distinct route over the land of the defendant.

*Wright v. Freeman,* 5 H. & J. 467, 477 (1823). In *Vogler v. Geiss,* 51 Md. 407, 410 (1879), we stated in clearer language:

> It is now very well settled, by authorities of the highest character, that a party entitled to a right of way or other mere easement in the land of another may abandon and extinguish such right by acts *in pais,* and without deed or other writing. The act or acts relied on, however, to effect such result, must be of a decisive character; and while a mere declaration of an intention to abandon will not alone be sufficient, the question, whether the act of the party entitled to the easement amounts to an abandonment or not, depends upon the intention with which it was done, and that is a subject for the consideration of the jury. *A cesser of the use, coupled with any act clearly indicative of an intention to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time.* [Second emphasis added.]

The law in Maryland with respect to the abandonment of easements has remained the same, with but one possible aberration.[1] Moreover, the law has always focused on *intent.* Applying the long-standing legal principle to the facts of this case, excluding the effect of the federal statutes, the railroad clearly abandoned its right-of-way: there was a cessation of use since at least 1985, resolutions to abandon by both railroad companies (consent to abandon by one), a petition to the appropriate agency for an approval of the abandonment, and a determination by that agency that abandonment was appropri-

---

**1.** The Court of Special Appeals in *Anne Arundel County v. Baltimore & Annapolis Railroad,* 46 Md.App. 350, 416 A.2d 777 (1980), though faced with a jurisdictional question in a case in which the remaining issue before it was the applicability of an express reverter, opined at length on the nature of the abandonment requirements under federal railway abandonment statutes. The opinion assumed that federal regulatory abandonment requirements were the same as the Maryland law of abandonment. Whether they were the same was not at issue; nor was there any question as to regulatory unconstitutional takings issues. The issues before this Court in this case go to fundamental principles of Maryland property law and whether takings issues can be avoided by using the impact of the federal statutes to divest Maryland property owners of property rights they otherwise would possess.

ate. In my view, this is a classic example of abandonment. If the right-of-way at issue were not subject to the federal statutes, and the landowners abutting the easement were able to present in federal court the evidence presented here, it is clear, probably even under the majority's position, that the traditional elements of abandonment have been met. Except for the actions of the federal entities in attempting to have the federal statutes impact upon that abandonment, the decision of this Court should be simple. Instead, in an attempt to further the environmental concerns of the County and federal governments, the majority changes the law of Maryland, but says that change has always been the law. It has not always been the law and it cannot be logically so asserted.

The law has not changed since *Vogler.* We have maintained a consistent position until the majority's opinion in this case. In *Canton Co. v. Baltimore & Ohio Railroad,* 99 Md. 202, 217–19, 57 A. 637, 638–39 (1904), we found that no abandonment had occurred because there was only evidence of nonuse and no evidence of intent to abandon. Nonetheless, we restated the law of abandonment from *Vogler* that sufficient evidence of nonuse plus intent to abandon demonstrates an abandonment. *Id.* at 218, 57 A. at 639. We likewise reiterated the law in *Cityco Realty Co. v. Philadelphia, Baltimore & Washington Railroad,* 158 Md. 221, 226, 148 A. 441, 443–44 (1930):

> It is well settled ... that a party entitled to a right of way or other mere easement in the land of another may abandon and extinguish such right by acts *in pais.* The act or acts relied on, however, to effect such result, must be of a decisive character, and whether the act amounts to an abandonment or not depends upon the intention with which it was done. A cesser of the use, coupled with any act clearly indicative of an intention to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time. *Vogler v. Geiss,* 51 Md. 407; *Stewart v. May,* 119 Md. 10[, 85 A. 957 (1912) ]. * * * It seems to be generally agreed that in this matter no one case can be authority for another. Time is not a necessary element; it is not the duration of the non-user,

but the nature of the acts done or permitted, and the intention which the one or the other indicates, that are important.

*See also Millson v. Laughlin,* 217 Md. 576, 588, 142 A.2d 810, 816 (1958) ("Whenever abandonment or non-user, coupled with other circumstances, show an *intention* to make no further use of the easement, then it will have been extinguished. But *intention* to abandon is essential." (emphasis added)); *Brehm v. Richards,* 152 Md. 126, 131–32, 136 A. 618, 620 (1927) ("[C]esser of use, coupled with an act clearly indicative of an *intention* to abandon the easement, would have the same effect as an express release of it." (emphasis added) (citing *Stewart,* 119 Md. 10, 85 A. 957; *Vogler,* 51 Md. at 410)); *Knotts v. Summit Park Co.,* 146 Md. 234, 241, 126 A. 280, 282 (1924) ("A cesser of the use, coupled with any act clearly indicative of an *intention* to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time." (emphasis added)); *Public Service Comm'n v. Philadelphia, Baltimore & Washington R.R.,* 122 Md. 438, 443, 89 A. 726, 728 (1914) (same) (citing *Vogler,* 51 Md. 407; *Glenn v. Davis,* 35 Md. 208 (1872)).

One of the cases cited by the majority, *Maryland & Pennsylvania Railroad v. Mercantile–Safe Deposit & Trust Co.,* 224 Md. 34, 166 A.2d 247 (1960), is factually similar to the present case if the impact of the federal statutes is not considered. In that case, the "Ma & Pa" Railroad had used the subject property as a railroad until 1958. That year it ceased operations and removed the rails and ties. The trial court found that the railroad's title was to an easement only and that the easement had been abandoned. On appeal, this Court held that removal of the rails and ties from the easement constituted an abandonment of it, and noted:

The general rule is that the right and title to a *mere* easement in land acquired by a *quasi*-public corporation, either by purchase, condemnation or prescription, for a public purpose is dependent upon the continued use of the property for that purpose, and when such public use is

abandoned the right to hold the land ceases, and the property reverts to its original owner or his successors in title. *Id.* at 39, 166 A.2d at 250. After distinguishing *Canton Co.*, 99 Md. 202, 57 A. 637, on the basis that the railroad officials in that case had testified they had no intention to abandon the right-of-way, while in *Maryland & Pennsylvania Railroad* there had been no disclaimer of an intent to abandon, we further discussed the Maryland law of abandonment:

> [T]he law is well settled that the *intent* to abandon may be shown by the acts of a party indicating such an *intention.* Therefore, since the uncontroverted evidence in the present case was to the effect that the defendant had ceased to operate as a railroad in 1958 and had removed its rails and ties from the right of way, and since time is not an element in abandonment if it is shown that use of the easement has ceased and there has been some act clearly indicative of an *intention* to abandon the right of further use, it was proper for the trial court to conclude, as it did, that there had been abandonment.

*Maryland & Pennsylvania R.R.*, 224 Md. at 40, 166 A.2d at 250 (citations omitted) (emphasis added).

In *East Washington Railway Co. v. Brooke*, 244 Md. 287, 223 A.2d 599 (1966), a railway company had obtained possession of a right-of-way through a prescriptive easement.[2] Addressing whether the right-of-way had been abandoned, we said:

> The removal of the ties and rails, plus the statement of Mr. Rector, the president and general manager of defendant, that the company has no *intentions* of ever operating a railroad over the contested strip, indicates that the use of the property for railroad purposes has been abandoned. In

---

**2.** The railway's deed to the property had been preceded by a conveyance to another party. The trial court thus ruled that the railway's deed was invalid, but then found that because it had operated the rail line for the period necessary to obtain a prescriptive easement, it had a valid right-of-way. *East Washington Ry.*, 244 Md. at 289, 223 A.2d at 600–01. The issue, therefore, was whether it had abandoned the right-of-way it had obtained by prescription.

*Ma. & Pa., supra,* it was stated at page 39 of 224 Md., [166 A.2d at 250]:

> "The general rule is that the right and title to a *mere* easement in land acquired by a *quasi*-public corporation, either by purchase, condemnation or prescription, for a public purpose is dependent upon the continued use of the property for that purpose, and when such public use is abandoned the right to hold the land ceases, and the property reverts to its original owner or his successors in title."
>
> See also *Hagerstown & F. Rwy. Co. v. Grove,* 141 Md. 143, 118 Atl. 167. Compare *Canton Co. v. Balto. & Ohio R. Co.,* 99 Md. 202, 57 Atl. 637. Because it has abandoned the right-of-way, the Railroad and its successor have no existing claim to the contested strip of land.

*Id.* at 293, 223 A.2d at 603 (emphasis added); *see also D.C. Transit Systems, Inc. v. State Roads Commission,* 259 Md. 675, 690–93, 270 A.2d 793, 801–02 (1970) (*D.C. Transit I* ) (restating the law of abandonment by quoting *Maryland & Pennsylvania R.R.* at length).

In *D.C. Transit System, Inc. v. State Roads Commission,* 265 Md. 622, 290 A.2d 807 (1972) (*D.C. Transit II* ), we upheld the trial court's finding of abandonment, notwithstanding the railroad officials' attempts to disclaim an intent to abandon:

> The only question presented here, of course, is whether DCT has abandoned the easements. Relying on *Canton Co. v. Baltimore & Ohio R. Co.,* 99 Md. 202[, 57 A. 637] (1904), it argues that nonuser is insufficient to establish abandonment unless an intention to abandon can be shown. While we agree this is a correct statement of the law, we think *Canton* is factually distinguishable from the case at bar.
>
> *It is generally conceded that the abandonment of a right of way is to a large extent a matter of intent;* rarely, however, is intent proved directly. *See, e.g., Maryland & Pa. R. Co. v. Mercantile–Safe Deposit & Trust Co.,* 224 Md. 34, 40[, 166 A.2d 247] (1960); 44 Am.Jur. *Railroads* § 108 (1942). Of course, statements of company officials indicat-

ing an intention to abandon or no longer to use a right of way have been afforded considerable weight in finding an abandonment. *People v. Ocean Shore R., Inc.,* 32 Cal.2d 406, 196 P.2d 570 (1948); *Westcott v. New York & N.E. R. Co.,* 152 Mass. 465, 25 N.E. 840 (1890). Ordinarily, however, statements *disclaiming* an intent to abandon, while of some value, are too weak and too insufficient to bar a contrary finding where there is other evidence. *Ocean Shore R. Co. v. Doelger,* 179 Cal.App.2d 222, 3 Cal.Rptr. 706 (1960); *see Canton, supra.* The rule has evolved, therefore, that to produce the abandonment of an easement there must be action in respect of its use which indicates an *intention* never to make use of it again. 2 American Law of Property § 8.97 (A.J. Casner ed.1952). This rule, in varying forms, has been applied in most jurisdictions. *See, e.g., Maryland & Pa. R. Co., supra; Hagerstown & Frederick R. Co. v. Grove,* 141 Md. 143[, 118 A. 167] (1922); *Smith v. Harris,* 181 Kan. 237, 311 P.2d 325 (1957); *Sindler v. Wm. M. Bailey Co.,* 348 Mass. 589, 204 N.E.2d 717 (1965); *United Parking Stations, Inc. v. Calvary Temple,* 257 Minn. 273, 101 N.W.2d 208 (1960); *Freedman v. Lieberman,* 2 N.J.Super. 537, 64 A.2d 904 (1949); *Spaeder v. Tabak,* 170 Pa.Super. 392, 85 A.2d 654 (1952); *Spangler v. Schaus,* [106 R.I. 795,] 264 A.2d 161 ( [ ] 1970).

*Id.* at 625–26, 290 A.2d at 810 (emphasis added).

D.C. Transit System contended in that case that it never intended to abandon the right-of-way (a trolley line), but that its intent was "that of planning to use the land for a monorail system and alternatively for a high speed bus line." *Id.* at 624, 290 A.2d at 809. By contrast, the uncontested evidence in the case *sub judice* was that railroad officials intended to abandon the right-of-way, passed resolutions as such, and filed petitions for abandonment. In *D.C. Transit II,* the trial judge had specifically found that "[v]arious officers of the Transit Company testified that a monorail system has been under study since at least 1957." *Id.* Conversely, the uncontested evidence in the case *sub judice* showed that the railroad officials clearly contemplated the abandonment of service and

that, only after arrangements were made for a quit claim deed to be delivered to the County by the railroad company, despite the ICC's preliminary finding that abandonment was appropriate, did the County acquire whatever the railroad had possessed. In *D.C. Transit II,* many documents supported the railroad's position that when it discontinued rail service and removed the rails, it did not intend to abandon the right-of-way, but to use it for future transit service by monorail or high-speed buses. The evidence supporting disclaimer of abandonment in *D.C. Transit II* is one hundred percent stronger than the evidence in the case at bar, in which *no* evidence exists of anything other than an intent to abandon.

In the present case, the railroad made a decision not to repair the bridge over Rock Creek Park. It then ceased use of the right-of-way in 1985. In that same year, it passed explicit resolutions stating its official intention to abandon. The railroad then filed a petition with the ICC informing that agency of its intention to abandon. *Cf. Thompson v. Maryland & Pennsylvania R.R. Preservation Soc'y,* 417 Pa.Super. 216, 224, 612 A.2d 450, 454 (1992) (noting that an ICC certificate of abandonment is evidence of intent to abandon a property interest), *appeal denied,* 533 Pa. 635, 621 A.2d 581 (1993). The ICC found that abandonment was appropriate. There was simply nothing more the railroad could do to prove abandonment. It used every means short of the Goodyear Blimp to announce its intent to abandon. The majority holds that because the ICC failed to approve the abandonment officially (while, coincidentally or intentionally, it was encouraging the railroad to quit claim its rights to the County, disregarding those who, under the Maryland law of abandonment, may have owned the property rights), there has been no abandonment. The majority fails to recognize that under Maryland law and the cases discussed, *supra,* abandonment is complete when two things exist: 1) cessation of use and 2) *intention* to abandon. Both of these elements exist in the case at bar. That is all the Federal Circuit wanted us to consider.

The majority does at least recognize that "abandonment" under the federal railroad commerce statutes has a different meaning than under general state property law. *See* majority op. at Part IV.B.1. Under federal law, the term applies to abandonment of *service,* while under state law it refers to abandonment of the relevant *property interest. See, e.g., Burlington N. R.R. v. Kmezich,* 48 F.3d 1047, 1050 (8th Cir.1995) ("Actual cessation of service extinguishes interests under the [state] statute. I.C.C. abandonment is not the triggering event."); *Penn Cent. Corp. v. U.S. R.R. Vest Corp.,* 955 F.2d 1158, 1159 (7th Cir.1992) (noting there are "two senses of abandonment"; one of service and one of title to property); *cf. Thompson,* 417 Pa.Super. at 227, 612 A.2d at 455 ("A [state] certificate granting permission to abandon railway crossings is not dispositive of whether or not a railroad has abandoned a right of way, as the certificate, without more, does not constitute abandonment."). What the majority fails to recognize, however, is that abandonment of the property interest can occur *before* abandonment of service is approved by the federal government. *See Preseault v. United States,* 100 F.3d 1525, 1546–49 (Fed.Cir.1996) (affirming trial court's decision that a railroad abandoned its easement ten years before seeking ICC approval of service abandonment); *Burlington N. R.R.,* 48 F.3d at 1050 (holding that, under Iowa state law, railroad abandoned its right-of-way interest when it ended service "prior to 1985," not when the ICC approved the abandonment of service in 1985); *Kansas City Area Transp. Auth. v. 4550 Main Assocs.,* 742 S.W.2d 182, 190 (Mo.Ct.App. 1986) (noting that the holders of a right-of-way abandoned their interest by selling it six days prior to ICC approval of rail service abandonment), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1020, 98 L.Ed.2d 985 (1988). Thus, despite the majority's contention, the railroad in this case could and did abandon its right-of-way property interest even though the ICC had not formally approved abandonment of service. It follows that the scope of the original right-of-way is irrelevant because the evidence reflects that the railroad intended to abandon its

property interest entirely, long before its purported conveyance to the County.

The majority also fails to see that, despite the federal approval of service abandonment, it is only the abandonment of the property interest that determines whether the purported reversionary property interests in this case vested and were subsequently "taken" under the federal rails-to-trails law. Justice Sandra Day O'Connor recognized as much in her concurrence in *Preseault v. ICC*, 494 U.S. 1, 21, 110 S.Ct. 914, 926, 108 L.Ed.2d 1 (1990) (O'Connor, J., concurring), when she stated: "Determining what interest [the holders of the right-of-way] would have enjoyed under Vermont law, *in the absence of the ICC's recent actions*, will establish whether [the holders of the right-of-way] possess the predicate property interest that must underlie any takings claim." (Emphasis added.) Justice O'Connor, joined by Justices Scalia and Kennedy, further explained that

> the [ICC]'s actions ... do not displace state law as the traditional source of the real property interests. The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights. Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment.

*Id.* at 22–23, 110 S.Ct. at 927, 108 L.Ed.2d 1 (O'Connor, J., concurring) (citations omitted); *see also National Wildlife Fed'n v. ICC*, 850 F.2d 694, 706 (D.C.Cir.1988) ("In any individual case, the effect of trail use on the reversionary owner's property rights will depend, in part, on precisely what those rights are *under relevant state law*." (Emphasis added.)). The position of Justices O'Connor, Scalia, and Kennedy in *Preseault* is, in my view, the appropriate position. The majority's position in this case does *exactly* what Justice O'Connor said would occur; it converts the "ICC's power to preempt conflicting state regulation of interstate commerce

into the power to preempt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment."

Instead of recognizing the role of state property law, the majority creates a new, third element in the law of abandonment for Maryland. That is, in addition to cessation of use and intent to abandon a property interest, the easement holder also must receive approval of federal authorities of a service cessation, if statutes require such approval, prior to the vesting of reversionary property interests that traditionally would have occurred. In doing so, the majority refuses even to pay lip service to the Fifth Amendment's property rights provisions. The majority does for the federal government what the Supreme Court has said the federal government cannot do. I reiterate that the federal court was well aware of the federal regulations necessitating approval; the federal regulations and their "takings" effect are the crux of the issue the federal court is deciding. It did not need that information from this Court. It merely wanted to know what, in the absence of the federal regulations, was the law of abandonment in Maryland governing the purported reversionary interest.

The majority goes to some length to argue that the uses the County intends for the property are within the scope of the original right-of-way of the railroad company. I disagree. But, more importantly, that scope is not relevant to whether the railroad company abandoned its right-of-way. If it abandoned its right-of-way, it abandoned all of it and it abandoned it prior to transferring the quit claim deed to the County. As to the question certified to this Court, whether the right-of-way has been abandoned, the intentions of the County as to future uses have absolutely no relevance. If the withholding of abandonment approval pursuant to the federal statutes is the reason the majority proffers, as it appears to, as to why the right-of-way has not been abandoned, that approval is still being withheld.

The County's intentions have nothing to do with this case. Its quit claim deed was extracted from the railroad after the point that abandonment had taken place under what, prior to this case, used to be the law. If the right-of-way was abandoned before the County bought its quit claim interest, it bought a lawsuit. If not, then the certified question is answered and additional questions as to what the County bought have nothing to do with the certified question and should be left to another case, if necessary.

This is the second time in this term that the Court has rendered decisions that constitute, in my view, drastic departures from the theretofore accepted legal doctrines and theories relating, directly or indirectly, to the law of real property. In the present case, the Court adds a new element, final regulatory approval, to the centuries-old Maryland law of abandonment of easements by merely stating that it is so, although the simplicity of the majority's position is subtly contained in the eighty-plus pages of the Court's opinion.

In the Court's departure from long-standing real property principles, the majority in *Matthews v. Amberwood Associates Ltd. Partnership*, 351 Md. 544, 719 A.2d 119 (1998), held that an unenforced "no pets" provision in a lease subjected a landlord to negligence liability for damages sustained by a tenant's guest, who was attacked within the tenant's premises by the tenant's dog. In my view, no prior Maryland case had ever held a landlord liable for the negligence of a tenant where the act complained of and the resulting injuries that occurred to a tenant's guest were completely within the confines of the leased premises.

The law of property, and its related fields such as landlord-tenant law, have been among the most stable areas of the law. In my view, that stability has, over the years, been a positive influence on the law. That body of law now may be perceived by real property practitioners as a field of law under attack as a result of the Court's decisions this term.

In my view, the majority's position is result-oriented. I have no quarrel with the idea that unused railway rights-of-

way are potential resources for recreation and environmental protection. The elements of the law of abandonment are, in substantial part, judge-made law and, while I do not advocate such an approach, this Court presumably has the power to impose prospectively an additional element in respect to the doctrine. Instead of now imposing a new, prospectively applicable element, however, the majority holds that this new element, approval of federal agencies, has always been part of the Maryland law of abandonment. That simply is not so.

Finally, the majority's opinion will leave members of the bar at risk who may have been advising clients on abandonment issues under the traditional cessation of use and evidence of intent standards. We owe it to the bar to acknowledge change, even if it means acknowledging a departure from precedent or from the holdings of prior cases, when change is what the Court is doing.